**Affirmed and Opinion filed June 26, 2012.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

## NO. 14-10-01193-CR

### SUSAN LUCILLE WRIGHT, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 263rd District Court
Harris County, Texas
Trial Court Cause No. 937134**

## OPINION

In this appeal, we consider, among other issues, the impact of media coverage on a defendant's right to a fair trial. Appellant Susan Lucille Wright, who, in 2004, was convicted of murdering her husband, appeals the trial court's judgment following a new punishment trial in 2010. She asserts that (1) her right to a fair trial was violated when the trial court permitted news media in the courtroom; (2) the trial court denied her right to present a complete defense through adverse evidentiary rulings on evidence of the complainant's relationship with appellant and their children; (3) core attorney work-product was improperly admitted into evidence; and (4) the State improperly commented on appellant's right not to testify. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Following a trial in 2004, a jury convicted appellant of murdering her husband and assessed punishment at twenty-five years' confinement. This court affirmed the trial court's judgment. *See Wright v. State*, 178 S.W.3d 905, 911 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). Later, appellant filed an application for writ of habeas corpus, claiming her trial counsel had rendered ineffective assistance. Upon granting partial relief, the Court of Criminal Appeals set aside the trial court's judgment and remanded the case for a new punishment trial. *Ex parte Wright*, No. AP-76245, 2009 WL 3474099, at *1 (Tex. Crim. App. Oct. 28, 2009) (not designated for publication) (per curiam).

At the new punishment trial, with the exception of a few exhibits, the trial court admitted into evidence all of the same evidence admitted in the guilt-innocence phase of appellant's 2004 trial. The medical examiner testified that, on January 19, 2003, he arrived at the home appellant shared with the complainant (her husband) and their two minor children. He found the complainant's dead body partially buried in the backyard. Ligatures bound each of the complainant's wrists and one of his ankles.

An autopsy was conducted. The medical examiner counted over 193 stab wounds covering the complainant's body. He ruled the cause of death as multiple sharp-force injuries. Almost all of the wounds were inflicted to the front of the complainant's body, which is consistent with a theory that the complainant was restrained on his back by ligatures on his hands and feet, or incapacitated to the degree he could not escape. According to the medical examiner, with the exception of the injuries to the complainant's brain, none of the wounds, singularly, were immediately incapacitating or even fatal, although the complainant would not have lived much longer after suffering some of the more life-threatening injuries.

In the backyard of the home, investigators recovered a mattress heavily saturated with blood. Inside the home, investigators recovered empty bottles of bleach and clothing that had been bleached. Investigators recovered a bloodied knife from outside

2

the home; the tip of the knife had broken off in the complainant's scalp. In the master bedroom, investigators observed blood spattered on the walls, ceiling, and furnishings of the room, fresh paint on the wall where the headboard of the bed would have been, a paint can and brush, a portion of carpet and carpet padding missing, and a box cutter; only a footboard and rails remained of the bed. Appellant eventually was charged with the complainant's murder. Investigators formed the theory that appellant tied the complainant to the bed, stabbed him repeatedly, dragged his dead body outside, buried the body, and then attempted to cover up evidence of the crime.

Appellant's mother-in-law (the complainant's mother) testified that she last spoke to the complainant on Monday evening, January 13, 2003, as he was driving home from a boxing lesson. Several hours later, she received a phone call from appellant; during the call, appellant stated that the complainant was under the influence of narcotics when he arrived home and that he had struck their young son. Appellant told her mother-in-law that she and the complainant had argued and that the complainant left the home on foot after she kicked him out.

In the week preceding the discovery of the complainant's body, appellant spoke with many people, including a physician, who treated cuts on her hands, and a law enforcement officer, who issued a warrant for the complainant's arrest based on appellant's allegations that the complainant assaulted her and her son on the night of January 13, 2003. In these conversations, appellant's allegations evolved from the complainant striking their child to allegations that the complainant also had struck her. In some conversations, appellant explained the cuts on her hand as being the result of scratches inflicted by the complainant's fingernails or being cut by the complainant with a set of keys. In some of these conversations, appellant expressed fear that the complainant would return to harm her. Appellant also told some people that the complainant, at one point, had returned home, ransacked the home, poured bleach on her clothing, left a note, and left the home again, leaving his vehicle at the home. The record

3

reflects that at some point during the week, appellant changed the outgoing message on the family's voicemail system to omit the complainant's name.

Toxicology reports confirmed the presence of alcohol, cocaine, and GHB, commonly referred to as a "date-rape drug," in the complainant's blood at the time before his death. According to the record, the complainant had a prior criminal history involving possession of a controlled substance and misdemeanor assault on an ex-girlfriend. The ex-girlfriend testified to multiple instances of physical abuse she suffered at the complainant's hands during their relationship. According to the ex-girlfriend, each time she attempted to leave the relationship, the complainant would beat her.

The defense presented evidence that appellant was a stay-at-home mother of two young children who was unhappy in her marriage to the complainant. The defense presented testimony that the complainant was involved in narcotics, unfaithful in his marriage, physically abusive to his wife, and "aggressive" with his son. Several witnesses testified to seeing appellant once with a black eye. Several other witnesses testified that appellant once had a bruise on her forehead, which she claimed was the result of having been hit with a toy her child threw at her. Appellant's sister testified that she observed bruises on appellant's body many times throughout appellant's marriage. According to the sister, the complainant was "controlling" with the family's money and allowed appellant only $75 each week to provide necessities for the children and the home. The sister also claimed that the complainant insisted that appellant keep their home immaculate or else he would beat her.

According to evidence presented by the defense, on the evening of January 13, 2003, the complainant appeared "high" and attempted to roughhouse with his four-year-old son; the complainant ended up striking the child with a closed fist when the child lost interest in playing. After the child went to bed, appellant confronted the complainant and issued an ultimatum to him: he needed to get help for his addiction or else their circumstances needed to change. The record reflects that by some accounts, namely

4

according to what appellant told a doctor at a hospital psychiatric unit in the week following the killing, appellant claimed to have stabbed the complainant after they had sex and he had fallen asleep. By other accounts, namely via appellant's 2004 trial testimony in the guilt-innocence phase and as introduced through the same doctor's testimony, appellant claimed that the complainant physically assaulted her and also sexually assaulted her before threatening her with a knife; appellant struggled with the complainant over control of the knife and stabbed him in self-defense.

Close family members who saw appellant in the days preceding her arrest testified that appellant appeared withdrawn and terrified that her husband would return to harm her. Appellant eventually confessed to her parents to killing the complainant and voluntarily checked into a psychiatric unit at a hospital. One psychiatrist, Dr. Brown, who evaluated appellant at the request of appellant's 2004 trial counsel, Neal Davis, testified that appellant was depressed, disassociated from reality, easily frightened, and paranoid that the complainant was alive and would return to harm her. Dr. Brown opined that appellant suffered from post-traumatic stress disorder along with depression.

During Dr. Brown's initial evaluation, appellant told him that she stabbed the complainant after they had sex and the complainant fell asleep. Dr. Brown testified that appellant's explanation of the events, as told to him by appellant in his initial evaluation of her, differed, sometimes significantly, from appellant's 2004 trial testimony, which Dr. Brown had read in preparation for his own testimony at the punishment hearing. Dr. Brown recalled appellant's 2004 trial testimony as containing allegations that the complainant raped appellant and physically assaulted her before she stabbed him in self-defense. Dr. Brown did not consider the information gleaned from appellant in his initial evaluation as reliable as her trial testimony because appellant was "too disturbed" in her initial interview. Based upon information he learned from appellant, Dr. Brown classified appellant as a battered woman.

5

The defense called two expert witnesses to testify about the domestic violence. One expert theorized that, based on the testimony and evidence in the 2004 trial and at the current punishment hearing, appellant appeared to suffer from emotional abuse, intimidation, threats, financial stress, verbal abuse, and isolation from family members at the complainant's hands. According to the experts, women who have been physically abused by a spouse often lie to others about the injuries to avoid getting the spouse in trouble or to avoid suffering more physical abuse for reporting it. Both experts opined that the most dangerous time in an abused woman's life is when the woman attempts to leave an abusive spouse or partner. One expert characterized an abusive spouse, even when asleep, as an imminent threat to a battered woman based on the ongoing abuse in the relationship or against the children of the relationship. According to this expert, based on appellant's 2004 trial testimony, appellant was a battered woman.

In its charge to the jury, the trial court instructed the jury to consider the special issue of whether appellant caused the death under the immediate influence of sudden passion arising from an adequate cause; the jury did not find by a preponderance of the evidence in favor of appellant on this special issue. The jury assessed punishment at twenty years' confinement. Appellant now appeals, seeking not only a new trial on punishment but also a new trial on guilt.

## II. ISSUES AND ANALYSIS

### A. Did presence of news media in the courtroom violate appellant's constitutional right to a fair trial?

In her first issue, appellant asserts that the presence of the news media over her objection—in both the 2004 trial and the 2010 punishment trial—amounts to structural error, requiring reversal. Appellant's primary argument under her first issue is that, under *Estes v. Texas*, the trial court committed structural, constitutional error by allowing television cameras in the courtroom during the 2010 punishment trial because the case had attracted nationwide media attention and because of the potential impact of the cameras on the jurors and the conduct of the trial. *See* 381 U.S. 532, 534–52, 85 S. Ct.

6

1628, 1628–37, 14 L. Ed. 2d 543 (1965) (plurality op.). Appellant asserts that no showing of harm is required because error under *Estes* is structural error. Appellant also asserts that *Estes* is binding precedent for this proposition. We conclude these arguments lack merit, as shown by the United States Supreme Court's opinion in *Chandler v. Florida*. *See* 449 U.S. 560, 562–83, 101 S. Ct. 802, 803–14, 66 L. Ed. 2d 740 (1981).

In *Chandler*, the Supreme Court held that allowing television or photographic coverage of a criminal trial over the defendant's objection is not inherently a denial of due process. *See id*., 449 U.S. at 562–80, 101 S. Ct. at 803–12. In so holding, the *Chandler* court concluded that Justice Clark's opinion in *Estes* was a plurality opinion and that *Estes* does not provide any binding precedent for the proposition that allowing such coverage of a criminal trial is inherently a denial of due process. *See id*., 449 U.S. at 570–74, 101 S. Ct. at 807–09. Rather, the *Chandler* court concluded that the *Estes* holding is limited to the conclusion that what was done at Estes's trial violated Estes's right to a fair trial under the Fourteenth Amendment's Due Process Clause. *See id*., 449 U.S. at 572–73, 101 S. Ct. at 808–09. Therefore, in the case under review, the trial court's action in allowing media coverage of appellant's 2010 punishment trial over her objection was not structural, constitutional error. *See id*., 449 U.S. at 562–80, 101 S. Ct. at 803–12.

In the alternative, appellant argues that, even if a showing of prejudice is required, prejudice is shown on this record as to the 2010 punishment trial. Under *Chandler*, appellant can establish a violation of the Fourteenth Amendment's Due Process Clause by showing that (1) the media's coverage of her case (whether print or broadcast media) compromised the ability of the jury to judge appellant fairly, or (2) the broadcast coverage of her case had an adverse impact on the trial participants sufficient to constitute a denial of due process.[1] *See id*., 449 U.S. at 581, 101 S. Ct. at 813. To

---

[1] Consistent with her primary argument under *Estes*, appellant preserved error in the trial court as to the 2010 trial only by obtaining an adverse ruling on her "Motion to Exclude Television Cameras from the Court Room" at the beginning of trial. When the trial court overruled that motion, trial had not occurred

7

demonstrate prejudice, appellant must show something more than juror awareness that the trial would attract the attention of broadcasters. *See id*. As in *Chandler*, appellant has not attempted to show with any specificity that the presence of cameras impaired the ability of the jurors at the 2010 punishment trial to decide the case on only the evidence before them. *See id*. Appellant cites to no evidence in this regard.[2] As in *Chandler*, the record does not reflect that appellant requested an evidentiary hearing to show adverse impact or injury allegedly caused by the media coverage of the 2010 trial.[3]

During voir dire, the trial court instructed the venirepersons that they should not allow the media coverage of the trial to influence in any way their decision-making process should they serve on the jury. The trial court also instructed the jury not to watch, read, or listen to the media coverage of the trial. Appellant has not cited any evidence in the record that the members of the jury failed to follow these instructions.

Nor does the record contain evidence that would suggest the media's coverage of appellant's punishment trial compromised the jury's ability to attend to the proceedings or to judge the facts fairly. The record reflects that the trial judge took precautions to safeguard the integrity of the trial proceedings and to minimize the impact of media presence. In denying appellant's motion, the trial court noted counsel for the parties would not be individually outfitted with microphones. Although the record contains references to a microphone device at the judge's bench and counsel tables, the trial court instructed the parties on how to personally mute microphones and offered the parties the

---

and thus there could be no evidence of prejudice under *Chandler*. *See Chandler*, 449 U.S. at 581–83, 101 S. Ct. at 813–14. The *Chandler* court did not address whether a defendant must preserve error in the trial court regarding alleged prejudice caused by media coverage, and we presume, without deciding, that appellant may raise this issue for the first time on appeal. *See id*.

[2] Appellant cites to parts of the record regarding Venireperson 38, who voiced concerns during voir dire regarding media coverage of the trial and who was the subject of a peremptory strike by the State. Because this venireperson never served on the jury, this part of the record does not show that the presence of cameras impaired the ability of the jurors who served on the jury to decide the case on only the evidence before them.

[3] Appellant did not file a motion for new trial.

opportunity to unplug the microphones at any time; the record does not reflect that microphones were positioned towards the jury box. The trial court stated on the record that the proceedings would not be televised live and that the jurors would never be filmed.

As to whether the broadcast coverage of the trial had an adverse impact on the trial participants sufficient to constitute a denial of due process, appellant cites to evidence that (1) the trial court instructed a cameraperson once that she was taking pictures too close to the jury box; (2) during another witness's testimony, the trial court appears to have instructed a cameraperson to "turn that flash off or get out of the courtroom"; (3) one witness talked to a television reporter during a break in his testimony during the 2010 punishment trial; (4) the trial court indicated that it was appropriate for one witness to have "looked at himself on TV," noting that the trial judge "did the same thing last night myself"; (5) the trial court refused to put appellant's former counsel, who allegedly was serving as a "press spokesman" during the 2010 trial, under "the Rule"; (6) in determining whether a work-product objection was waived, the trial court called this same former counsel to the bench to discuss whether through the former counsel's conduct at a habeas corpus hearing this objection had been waived; and (7) the State called as a witness a woman who had been the complainant's girlfriend before the complainant married and that witness screamed during her testimony to show the jury how appellant had screamed at her when she called on the telephone seeking to reestablish contact with the complainant.

The two camerapersons whom the trial court admonished appeared to be taking still pictures rather than video. *See id*., 449 U.S. at 581, 101 S. Ct. at 813 (casting second possible form of prejudice in terms of adverse impact on the trial participants caused by the "broadcast coverage" of the case). In any event, the record does not reflect that these two instances disrupted the trial or had any significant impact on the trial participants. Evidence that one witness talked to a television reporter during a break in his testimony

9

and watched media coverage regarding his testimony does not, by itself, show an adverse impact on that witness sufficient to constitute a denial of appellant's right to due process. The record reflects that the jury was not present when the witness spoke with the reporter in the courtroom during a break in the testimony, and the witness testified that he was not aware that the person was a reporter. The record in this case does not show that the presence of television cameras in the courtroom adversely impacted any witness's testimony.

The trial judge's admission that he had watched media coverage of the trial does not establish that the broadcast coverage of the trial had an adverse impact on the trial judge. Even if appellant's former counsel was serving as a "press spokesman" during the 2010 trial, the record does not reflect that the trial court refused to put the former counsel under "the Rule" or called counsel to the bench regarding the work-product issue because of the media coverage of the trial. In addition, the State reasonably could have called the complainant's former girlfriend to testify and elicited the testimony regarding appellant's screaming on the telephone in an effort to persuade the jury, as opposed to playing to the television cameras.

Appellant notes that, unlike the facts in *Chandler*, there was national media attention regarding the case under review and the entire 2010 trial was televised, as opposed to cameras being present only for one witness and closing arguments. *See id.*, 449 U.S. at 567–68, 101 S. Ct. at 806. Nonetheless, on this record, we conclude appellant has not shown that the 2010 punishment trial involved a "Roman circus" or "Yankee Stadium" atmosphere, as in *Estes*, or that the unsequestered jury was exposed to "sensational" coverage, in the sense of *Estes* or of *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). *See Chandler*, 449 U.S. at 582–83, 101 S. Ct. at 813–14. Appellant has not shown that (1) the media's coverage of her case (whether print or broadcast media) compromised the ability of the jury to judge appellant fairly, or (2) the broadcast coverage of her case had an adverse impact on the trial participants

10

sufficient to constitute a denial of due process.[4] *See id.* Because there has been no showing of prejudice of constitutional dimensions to appellant, we conclude that the presence of cameras in the courtroom during the 2010 trial did not violate the Fourteenth Amendment's Due Process Clause.[5] Accordingly, we overrule the first issue.[6]

**B. Did appellant preserve error regarding her argument that the trial court violated her constitutional right to present a meaningful defense?**

In appellant's second issue, appellant complains that the trial court violated her constitutional right to present a meaningful defense when it excluded evidence of her relationship with the complainant while the court allegedly gave the State free rein to introduce a variety of irrelevant and prejudicial evidence. Appellant points to the record reflecting that the trial court repeatedly sustained the State's objections to hearsay and speculation when defense counsel delved into appellant's relationship with the complainant and the complainant's treatment of their children, and then subsequently overruled appellant's valid evidentiary objections. Appellant also claims the State improperly attempted to impeach witnesses with appellant's testimony or with other witnesses' statements in violation of Texas Rule of Evidence 612. According to appellant, the trial court's various evidentiary rulings prevented her from presenting a meaningful defense because evidence relevant to her theory of the case—that she was

---

[4] Appellant and the State argue as to whether a de novo or abuse-of-discretion standard of review applies. For the purposes of our analysis, we presume, without deciding, that a de novo standard of review applies.

[5] In her first issue, appellant also asserts that her due process rights were violated by the media coverage of her 2004 trial. But appellant does not brief this argument. Even if she had briefed this argument, it would be untimely. Appellant appeals from a new trial on punishment only after her conviction was affirmed on appeal. In this context, appellant cannot raise complaints on appeal regarding her 2004 trial. *See Easton v. State*, 920 S.W.2d 747, 749 (Tex. App.—Houston [1st Dist.] 1996, no pet.); *Rische v. State*, 834 S.W.2d 942, 948 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd).

[6] Appellant asserts that the State waived its right to oppose a reversal based on the first issue because the State did not oppose her motion to exclude television cameras from the courtroom. The State neither opposed nor supported appellant's motion. We disagree that this conduct prevents the State from arguing on appeal that no constitutional violation occurred. In any event, even if the State asserted on appeal that this court should sustain the first issue, this court still would have to make an independent determination, and this court still could conclude that this issue lacks merit. *See Martin v. State*, 346 S.W.3d 229, 233 n.1 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

abused by the complainant—was excluded. Appellant contends that the cumulative effect of the rulings resulted in a deprivation of her constitutional right to present a complete defense and violated her rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

To preserve a complaint for appellate review, a party must present to the trial court a timely, specific request, objection, or motion, and obtain a ruling. Tex. R. App. P. 33.1(a). An appellate contention must comport with the specific objection made at trial. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). An objection based on one legal theory in the trial court may not be used to support a different legal theory on appeal. *Broxton v. State*, 909 S.W.2d 912, 917–18 (Tex. Crim. App. 1995) (holding that appellant failed to preserve complaint that appellant was denied his constitutional right to present a defense). Even constitutional errors may be waived by failure to object at trial. *Id.* The record does not reflect that appellant asserted in the trial court that the evidentiary rulings violated her constitutional right to present a defense; rather, the record reflects that appellant asserted objections to the evidence as constituting hearsay and calling for speculation. In fact, appellant did not assert any constitutional violation or any objection grounded on a violation of Texas Rule of Evidence 612. Therefore, we conclude appellant failed to preserve error on this issue. *See id.* Accordingly, we overrule appellant's second issue.

## C. Did the trial court reversibly err in allowing testimony about an expert's conversation with appellant's former trial counsel, in violation of the attorney work-product doctrine?

In her third issue, appellant asserts that the trial court improperly admitted evidence of her former trial counsel's core work product through Dr. Brown's testimony about his telephone conversation with appellant's 2004 trial counsel, Neal Davis.[7] We

---

[7] Appellant claims the error is of constitutional magnitude on the ground that it violated her right to present a meaningful defense under the Fifth, Sixth, and Fourteenth Amendments. Appellant also claims that the trial court's error violated her right to counsel under the Sixth Amendment. Appellant did not raise any of these arguments in the trial court, and therefore failed to preserve these arguments for

review a trial court's decision to admit evidence under an abuse-of-discretion standard. *See Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). We will uphold the trial court's decision to admit this evidence if the decision was within the zone of reasonable disagreement. *See id.* We do not reverse the trial court's ruling on the sole basis that we disagree with the decision. *See id.*

### *1. Relevant Facts*

Dr. Brown did not testify at appellant's 2004 trial. Appellant called Dr. Brown to testify in the 2010 punishment trial. On cross-examination, Dr. Brown admitted receiving a telephone call from Davis in February 2004, several weeks before the 2004 trial. Dr. Brown claimed to have learned in this phone call that appellant's anticipated trial testimony regarding the complainant's death conflicted with the version of events appellant recounted to Dr. Brown in his psychiatric evaluations of her. The trial court overruled appellant's objections to hearsay and to appellant's assertion that the evidence should not be admitted based on the attorney work-product doctrine and the attorney-client privilege. Dr. Brown, who had read the 2004 trial transcript, continued to testify about appellant's 2004 trial testimony. Later, when the State referred to Dr. Brown's conversation with Davis involving a "problem" with the conflicting accounts, appellant objected, asserting that such a reference was privileged; the trial court initially sustained the objection.

At a bench conference, the State asserted that appellant had waived any privilege at the writ hearing on appellant's ineffective-assistance claim against Davis, when a transcript of Dr. Brown's conversation with Davis was admitted into evidence at that hearing. Apparently, the transcript was used as evidence in the writ hearing to

---

appellate review. Tex. R. App. P. 33.1(a) (requiring that the record reflect a timely, specific, request, objection or motion stating the grounds for the ruling be presented to the trial court and that the trial court ruled on the request, objection or motion, or refused to rule). Even constitutional complaints may be waived by failure to raise a timely objection in the trial court. *See Saldano v. State*, 70 S.W.3d 873, 886–89 (Tex. Crim. App. 2002).

demonstrate why Davis did not call Dr. Brown in the 2004 proceedings. The trial court allowed the State to ask Dr. Brown about his concerns regarding the differing accounts; the State offered to ask only about what Dr. Brown said and not what Davis said in the conversation.

The cross-examination resumed and, as it proceeded, appellant renewed her objection several times when the State referred to the transcript of the conversation and questioned Dr. Brown about his concerns with appellant's differing accounts as expressed to Davis. The trial court overruled each objection. At one point the trial judge summoned the parties to the bench when, after another objection from appellant, the State referred to waiver of the privilege at the writ hearing. The trial court asked the attorney who had represented appellant during the habeas corpus proceedings but who no longer represented appellant, to approach the bench. The following exchange ensued:

[TRIAL JUDGE]: I would like to defer to you because you were certainly part and parcel to this hearing we're talking about whether the privilege is waived. It's my recollection the privilege was waived at that hearing.

[FORMER COUNSEL]: My understanding is that the privilege is only waived to the extent reasonably necessary to respond to a claim of professional misconduct. I think this goes way beyond any claim of deficient conduct on the part of Mr. Ward or Mr. Davis. This is—the fact that you filed a writ doesn't mean that the State has the opportunity to walk into an otherwise closed door that it wants to kick open.

[STATE]: With all due respect, Judge. Once they call him to the stand and now he's offering a certain opinion or spin on the facts, if he had an initial response to the initial facts, the Jury certainly has a right to know what was in his mind and the advice he gave. He is now on the stand testifying regarding his conversations with Susan Wright and what he believed them to be. We want to know what they were back then and, so.

[TRIAL JUDGE]: Well, I think we're treading on thin water here when we're asking about conversations between Dr. Brown and the defense attorney.

[STATE]: I'll rephrase my question.

[TRIAL JUDGE]: No, we're not going to rephrase. I think we've gone as far as we want to go, so let's move on to something else.

14

No other questions about Dr. Brown's conversation with Davis were posed during redirect or cross-examination.

The State recalled Dr. Brown for rebuttal purposes to question him about the inconsistent accounts. Before Dr. Brown's rebuttal testimony, outside of the jury's presence, appellant asserted that Dr. Brown's testimony about his conversation with Davis, if allowed, would violate the work-product doctrine and the attorney-client privilege. Appellant also referred to a memorandum filed with the trial court addressing whether appellant had waived the work-product objection by providing documents at the writ hearing.[8] The trial court ruled that it would allow the testimony, but that appellant was "free to make whatever additional objections [she] sees fit at the time the introduction of such evidence comes forward." Appellant objected to the following question posed by the State in referring to the transcript of the conversation with Davis:

> [STATE]: Okay. Now in February 22nd of 2004, when you first learn via telephone that she is actually saying rape, your first response is, well, now—

Appellant asserted various objections including violation of the work-product doctrine and the attorney-client privilege. The trial court overruled the objections.

Following this exchange, the State referred to the transcript, in which after learning for the first time that appellant was claiming self-defense, Dr. Brown told appellant's counsel that Dr. Brown would look at his notes and "see if there is any way to [. . .] get around that problem." Appellant renewed her previous objections to the testimony as being privileged from disclosure. At that point the trial court granted appellant a running objection. Dr. Brown testified that, regarding appellant's self-defense claim, he stated it would be "[appellant's] word against nobody's." Dr. Brown indicated that what he meant by saying this was that, if Dr. Brown was not involved, then it would be appellant's word against "nobody's" word. Dr. Brown also testified that he was saying that it would be appellant's word against the complainant's word and because the

---

[8] The memorandum is contained in the record.

15

complainant is dead, appellant could "say whatever she wants and it's her word against nobody's." Dr. Brown stated that he concluded his conversation with Davis by saying that he would call Davis if Dr. Brown had any "bright ideas." When the State asked whether Dr. Brown called again before the 2004 trial, the trial court overruled appellant's objection based on privilege. Dr. Brown testified that he did not get any "bright ideas" between the conversation with Davis and the 2004 trial. We presume, without deciding, that appellant preserved error regarding her complaint that the trial court erred in admitting evidence of Davis's work product through Dr. Brown's testimony about his telephone conversation with Davis.

### 2. Privileged Work-Product

Texas Rule of Evidence 503(b) governs the attorney-client privilege. *See Woodruff v. State*, 330 S.W.3d 709, 727 (Tex. App.—Texarkana 2011, pet. ref'd). Rule 503(b), entitled "Rules of Privilege," provides in pertinent part:

(1) *General rule of privilege.* A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

(A) between the client or a representative of the client and the client's lawyer or a representative of the lawyer;

(B) between the lawyer and the lawyer's representative;

(C) by the client or a representative of the client, or the client's lawyer or a representative of the lawyer, to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein;

(D) between representatives of the client or between the client and a representative of the client; or

(E) among lawyers and their representatives representing the same client.

(2) *Special rule of privilege in criminal cases.* In criminal cases, a client has a privilege to prevent the lawyer or lawyer's representative from disclosing any other fact which came to the knowledge of the lawyer or that representative by reason of the attorney-client relationship.

16

Tex. R. Evid. 503(b). Although not expressly provided in Rule 503(b)(2), an attorney's work-product privilege in criminal cases falls within subsection (b)(2). *Cameron*, 241 S.W.3d at 19; *Woodruff*, 330 S.W.3d at 728.

Materials that are prepared by or at the request of an attorney in anticipation of litigation are protected and privileged under the work-product doctrine. *See In re Bexar Cnty. Criminal Dist. Attorney's Office*, 224 S.W.3d 182, 186 (Tex. 2007); *Woodruff*, 330 S.W.3d at 729 (applying work-product doctrine to a criminal case). The primary purpose served by the work product doctrine is to shelter the mental processes, mental impressions, opinions, conclusions, and legal theories of the attorney, providing a privileged area within which the attorney can analyze and prepare the case. *In re Bexar Cnty. Criminal Dist. Attorney's Office*, 224 S.W.3d at 186. The work-product privilege is broader than the attorney-client privilege because, as pertinent in this case, the work-product privilege includes all communications made in preparation for trial, including those conversations with parties and non-party witnesses. *Id.* The privilege continues indefinitely beyond the litigation for which the materials originally were prepared. *Id.*

Davis's telephone conversation with Dr. Brown in connection with Davis's representation of appellant constitutes protected work product. *See id.* (providing that material prepared or mental impressions developed in anticipation of litigation or for trial or communications among a party's representatives in anticipation of litigation or for trial amounted to protected work-product). Likewise, the record reflects that Dr. Brown evaluated appellant and was retained to do so at Davis's request. Because Dr. Brown was "employed by the lawyer to assist the lawyer in the rendition of professional legal services," Dr. Brown was a representative of appellant's lawyer. *See* Tex. R. Evid. 503(a)(4)(A).

### 3. Alleged Waiver of Work-Product Protection

If a person holding a privilege against disclosure voluntarily discloses or consents to disclosure of any significant part of the privileged matter, that person waives any

17

privilege unless the disclosure itself is privileged. *See* Tex. R. Evid. 511(1); *Jones v. State*, 181 S.W.3d 875, 878 (Tex. App.—Dallas 2006, pet. ref'd) (finding waiver of privileged material when a defendant voluntarily disclosed the existence of a second statement to counsel in response to a prosecutor's cross-examination of the defendant with the defendant's initial statement to police). The proponent of the privileged material bears the burden to demonstrate waiver. *See Carmona v. State*, 941 S.W.2d 949, 954 (Tex. Crim. App. 1997); *Jones*, 181 S.W.3d at 878 (dealing with waiver of attorney-client privilege). Waiver may be inferred from the totality of the circumstances and reasonable inferences. *See Carmona*, 941 S.W.2d at 954.

There is no privilege under Texas Rule of Evidence 503 as to communications relevant to an issue of breach of duty by a lawyer to the client. *See* Tex. R. Evid. 503(d)(3) (providing that no privilege exists as to communications relevant to an issue of breach of duty by a lawyer to the client); Tex. R. Evid. 503(b)(2) (providing that, in criminal cases, "a client has a privilege to prevent the lawyer or the lawyer's representative from disclosing any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship"); *Cameron*, 241 S.W.3d at 19 (noting that work-product privilege falls within "special rule" of section 502(b)(2)); *Joseph v. State*, 3 S.W.3d 627, 637 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (involving absence of attorney-client privilege when client alleged ineffective assistance of counsel).

Appellant filed an application for a writ of habeas corpus, seeking reversal of her murder conviction on grounds that Davis rendered ineffective assistance of counsel in the 2004 proceedings. The record reflects that Dr. Brown testified at a hearing on the writ regarding the effectiveness of appellant's legal counsel. The transcript of the conversation between Dr. Brown and Davis, as reflected in this record, apparently was entered into evidence at the writ hearing to demonstrate that Davis did not call Dr. Brown to testify at the 2004 proceedings because Dr. Brown was privy to appellant's conflicting

18

accounts. A party's decision to produce protected written work product, including notes of conversations made in the course of a criminal investigation and information learned during a criminal investigation, unquestionably waives protection of such materials. *See In re Bexar Cnty. Criminal Dist. Attorney's Office*, 224 S.W.3d at 187. The parties do not dispute that appellant waived the work product privilege as to the transcript of Dr. Brown's conversation with Davis. For the purposes of our analysis, we presume that appellant did not waive the work product privilege as to the parts of Dr. Brown's testimony that the trial court admitted over appellant's objection based upon this privilege. In addition, we presume, without deciding, that the trial court erred in overruling these objections and admitting this testimony.

### 4. Harm Analysis

Appellant asserts that a constitutional harm analysis applies. But, the error, if any, was in admitting evidence in violation of appellant's work-product privilege. Constitutional error within the meaning of Texas Rule of Appellate Procedure 44.2(a) is an error that directly offends the United States Constitution or the Texas Constitution, without regard to any statute or rule that also might apply. *See Geuder v State*, 142 S.W.3d 372, 375 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). Further, with respect to the erroneous admission or exclusion of evidence, constitutional error is presented only if the correct ruling was constitutionally required. *See id.* Though the work-product privilege may have some relationship to appellant's Sixth Amendment right to effective assistance of counsel and her right to due process, the privilege is not a constitutionally protected right. *See Pope v. State*, 161 S.W.3d 114, 121–22 (Tex. App.—Fort Worth 2004) (concluding error in erroneous admission of work product was not constitutional error), *aff'd on other grounds*, 207 S.W.3d 352 (Tex. Crim. App. 2006). Excluding testimony by Dr. Brown regarding matters protected by the work-product privilege is not directly required by the United States Constitution or the Texas Constitution; therefore, we conclude that such error, if any, is not constitutional. *See*

19

*Pope*, 161 S.W.3d at 121–22; *Geuder*, 142 S.W.3d at 376.

We must disregard a nonconstitutional error that does not affect appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). Appellant's substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *See Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In assessing the likelihood the jury's decision was adversely affected by the error, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. *See id.* We also may consider the jury instructions, the State's theory and any defensive theories, closing arguments, voir dire, and whether the State emphasized the error. *See id.* at 355–56. Additionally, the presence of overwhelming evidence supporting the finding in question is a factor in evaluating harm. *See id.* at 356–58; *Lindsay v. State*, 102 S.W.3d 223, 229 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

Dr. Brown prepared for his testimony by reading through appellant's 2004 trial testimony. Dr. Brown testified in great length about both his evaluations of appellant and appellant's 2004 trial testimony. The State extensively cross-examined Dr. Brown on the inconsistencies between appellant's accounts and recalled Dr. Brown for rebuttal purposes on those same inconsistencies. In comparing that 2004 testimony to his own notes and memory of appellant's account to him during his evaluations of her, Dr. Brown testified, without reference to any conversation with Davis and without any objection, that the conflicting accounts were "very different."

In support of harm, appellant points to a note the jury sent to the trial judge during jury deliberations asking for Dr. Brown's notes, which were not admitted into evidence. But, the jury sent out six notes to the trial court during its deliberations, and in the note in question, the jury also asked for three other documents. In addition, we cannot determine

20

why the jury wanted to see Dr. Brown's notes. It may have been for reasons related to the differing accounts provided by appellant and not related to Dr. Brown's testimony regarding his conversation with Davis. In addition, the record contains overwhelming evidence that appellant did not cause the complainant's death under the immediate influence of sudden passion arising from an adequate cause. The State did not emphasize Dr. Brown's testimony regarding his conversation with Davis. Nor did the State refer to this testimony during closing argument. After carefully considering the record as a whole under the applicable legal standard, we have fair assurance that the parts of Dr. Brown's testimony that the trial court admitted over appellant's work-product objections did not influence the jury, or had but a slight effect. *See Motilla*, 78 S.W.3d at 358–59; *Lindsay*, 102 S.W.3d at 228–29. Accordingly, we conclude any error was harmless, and we overrule appellant's third issue.

**D.    Did the State improperly comment on appellant's Fifth Amendment right not to testify?**

In her fourth issue, appellant asserts the State improperly commented on her failure to testify in violation of her Fifth Amendment right in the following exchange during Dr. Brown's testimony:

> [PROSECUTOR]: Now, you had testified that rage, anger and resentment, that the multiple stabbing of Jeffrey Wright indicates a huge amount of rage, would you agree with that?
>
> [DR. BROWN]: It could, I said.
>
> [PROSECUTOR]: It could?
>
> [DR. BROWN]: I don't know the mixture of emotion she was feeling at that moment but it had to be something like that, yes.
>
> [PROSECUTOR]: Well, you don't know because she's the only person that was there that could testify about it, correct?
>
> [DR. BROWN]: That's right.
>
> [PROSECUTOR]: And at least at this point we've got two very—
>
> [DEFENSE COUNSEL]: Judge, I'm sorry. I'm going to have to object in regards to the way the question was phrased. I think that's an improper

21

comment on the defendant's right to testify or not to testify. And at this point in time I'm going to ask for a mistrial.

[TRIAL COURT]: It's overruled.

[PROSECUTOR]: Based on what we heard, there is at least two different versions of what happened that night. Would you agree with that?

[DR. BROWN]: In some respects, that's right, there are two different versions.

The State then questioned Dr. Brown as to numerous factors that could have caused appellant to feel anger towards the complainant, summarily querying, "And we really don't know what set off Susan Wright that night, do we?" Appellant did not object to this question.

Appellant also claims that the State compounded the alleged error by emphasizing the issue in closing argument. Specifically, appellant points to the following remark made by the prosecutor in closing argument: "Because ladies and gentlemen, it all goes back to the credibility of Susan Wright. . . there were only two people in that bedroom that night on January 13th, and one of them is dead. . . . And, so, we have to rely on Susan Wright's credibility even more [] to figure out what happened that night." Appellant characterizes these remarks as a comment on appellant's failure to testify.

These comments followed the State's observation that the defense, in opening statements, stressed the importance of distinguishing appellant's conduct leading up to the murder and following the murder. The State asserted that appellant's conduct following the murder is a direct reflection of her credibility and reflective of her state of mind leading up to and during the murder. Appellant did not object to the State's jury argument.

Any comment on a defendant's failure to testify violates both the state and federal constitutions as well as statutory law. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011). *See* Tex. Code Crim. Proc. Ann. art. 38.08. A defendant has a separate Fifth Amendment privilege not to testify at the guilt phase and the punishment phase of trial. *Randolph*, 353 S.W.3d at 891. A waiver at the guilt phase does not waive

the privilege at the punishment phase. *Id.* Accordingly, a comment on a defendant's silence at the punishment phase is improper even if the defendant testified at the first phase of trial. *Id.*

We consider whether appellant's Fifth Amendment right has been violated by viewing the State's comments from the jury's perspective; we resolve any ambiguities in favor of a permissible argument. *Id.* Any implication that the State referred to appellant's failure to testify must be clear and necessary. *Id.* Language that reasonably may be construed as an indirect or implied allusion does not constitute a violation. *Id.* We therefore consider whether the language used was manifestly intended or was of such a character that the jury necessarily and naturally would take it as a comment on appellant's failure to testify. *Id.* In applying this standard, we consider the context in which the comment was made to determine whether the language used was of such a character. *Id.*

According to the State, appellant failed to timely object because Dr. Brown already had answered the question and the prosecutor already had begun asking the next question. A timely objection should be made as soon as the ground for the objection becomes apparent to preserve error in the admission of evidence. *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997). If a party fails to object until after an objectionable question has been asked and answered, and the party does not show a legitimate reason justifying the delay, the objection is untimely and any error is waived. *Id.* Appellant did not object until the question had been asked and answered, and the prosecutor had begun asking the next question. The objection, therefore, was untimely, and appellant has failed to preserve error. *See id.* Likewise, appellant did not subsequently object to the State's other comments that form the basis of her complaint. *See* Tex. R. App. P. 33.1(a). But, even if we were to presume that appellant preserved this issue for appellate review, we would find no merit in it.

We review the trial court's ruling to deny appellant's motion for mistrial under an abuse-of-discretion standard. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). Under this standard, we view the evidence in the light most favorable to the trial court's ruling and uphold the ruling if it falls within the zone of reasonable disagreement. *Id.* A reviewing court cannot substitute its judgment for that of the trial court. *Id.* Rather, we decide whether the trial court's decision was arbitrary or unreasonable. *Id.* A trial court abuses its discretion when no reasonable view of the record could support the trial court's ruling. *See id.*

When, as in this case, a party requesting a mistrial does not first seek a lesser remedy, a reviewing court cannot reverse the trial court's judgment if the alleged error could have been cured by a less drastic alternative. *Ocon v. State*, 284 S.W.3d 880, 884–85 (Tex. Crim. App. 2009). *See also Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). Except in the most blatant cases, harm from a comment on a defendant's failure to testify is cured by an instruction to disregard. *Moore v. State*, 999 S.W.2d 385, 405–06 (Tex. Crim. App. 1999). Appellant did not request the trial judge to instruct the jury to disregard the question.

Appellant relies on *Crocker v. State*, 248 S.W.3d 299, 304–05 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd), a case in which the trial court erred in denying the defendant's request for an instruction to disregard a prosecutor's improper comment on the defendant's failure to testify, which provided, "You heard from the State's witnesses as to who was there . . . .[a]nd the State's witnesses only." *See id.* In *Crocker*, the comment improperly drew the jury's attention to the absence of evidence that only appellant's testimony could supply. *See id.* at 305. The case under review is factually distinguishable.

A party who fails to request an instruction for the jury to disregard forfeits appellate review of errors that could have been cured by such an instruction. *See Young v. State*, 137 S.W.3d 65, 70–72 (Tex. Crim. App. 2004). Even if the comment made by

the prosecutor in this case could be construed necessarily and naturally by the jury as a comment on appellant's failure to testify by drawing attention to evidence only appellant could supply, unlike the defendant in *Crocker*, appellant did not request an instruction to disregard. *See Crocker*, 248 S.W.3d at 305. Nor did the trial court *sua sponte* instruct the jury to disregard the comment. *See Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). Under these circumstances, because appellant did not request an instruction to disregard, the trial court did not err in denying her motion for mistrial.[9] *See Young*, 137 S.W.3d at 70–72. Accordingly, we overrule appellant's fourth issue.

Having overruled each of appellant's issues, we affirm the trial court's judgment.

/s/      Kem Thompson Frost
         Justice

Panel consists of Justices Frost, Seymore, and Jamison.
Publish — Tex. R. App. P. 47.2(b).

---

[9] To the extent appellant challenges the prosecutor's comment in closing argument, appellant did not object and thus failed to preserve error. *See Garcia v. State*, 887 S.W.2d 862, 877 (Tex. Crim. App. 1994) (holding that appellant failed to preserve error when appellant did not object to State's alleged comment during closing argument on appellant's failure to testify), *abrogated in part on other grounds by Hammock v. State*, 46 S.W.3d 889, 892–93 (Tex. Crim. App. 2001).