ACCEPTED
01-11-00258-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
3/26/2015 5:27:53 PM
CHRISTOPHER PRINI
CLERK

## No. 01-11-00258-CR

In the
Court of Appeals
For the
First District of Texas
At Houston

——————◆——————

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

3/26/2015 5:27:53 PM

CHRISTOPHER A. PRINE
Clerk

## No. 1284896

In the 177th District Court
Of Harris County, Texas

——————◆——————

**JEREMY THOMAS**
*Appellant*
V.
**THE STATE OF TEXAS**
*Appellee*

——————◆——————

STATE'S APPELLATE BRIEF

——————◆——————

**DEVON ANDERSON**
District Attorney
Harris County, Texas

**DAN MCCRORY**
Assistant District Attorney
Harris County, Texas
mccrory_daniel@dao.hctx.net

**GRETCHEN FLADER**
Assistant District Attorney
Harris County, Texas

1201 Franklin, Suite 600
Houston, Texas 77002
Tel.: 713/755-5826
FAX No.: 713/755-5809

*Counsel for Appellee*

ORAL ARGUMENT REQUESTED ONLY IF REQUESTED BY APPELLANT

# STATEMENT REGARDING ORAL ARGUMENT

Pursuant to TEX. R. APP. P. 39.7, the State requests oral argument only if oral argument is requested by appellant.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ............................................................. i

INDEX OF AUTHORITIES ............................................................................................. iii

STATEMENT OF THE CASE ......................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 1

SUMMARY OF THE ARGUMENTS.............................................................................. 6

REPLY TO POINT OF ERROR ONE.............................................................................. 8

REPLY TO POINT OF ERROR TWO............................................................................ 15

REPLY TO POINT OF ERROR THREE ........................................................................ 23

REPLY TO POINT OF ERROR FOUR .......................................................................... 31

CONCLUSION ............................................................................................................... 37

CERTIFICATE OF SERVICE........................................................................................ 38

CERTIFICATE OF COMPLIANCE ............................................................................... 38

# INDEX OF AUTHORITIES

**CASES**

*Arnold v. State*,
    234 S.W.3d 664 (Tex. App.--Houston [14th Dist.] 2007, no pet.)................................12

*Barley v. State*,
    906 S.W.2d 27 (Tex. Crim. App. 1995) ..........................................................17, 18, 21

*Beets v. State*,
    767 S.W.2d 711 (Tex. Crim. App. 1987) ......................................................................35

*Blue v. State*,
    41 S.W.3d 129 (Tex. Crim. App. 2000) ..........................................................25, 27, 28

*Dillard v. State*,
    No. 14-06-00940-CR, 2007 WL 3342029 (Tex. App.--Houston [14th Dist.]
    Nov.13, 2007, no pet.) (not designated for publication) .............................................35

*Ford v. State*,
    14 S.W.3d 382 (Tex. App.--Houston [14th Dist.] 2000, no pet.)..................................35

*Fransaw v. State*,
    671 S.W.2d 539 (Tex. App.--Houston [14th Dist.] 1983, pet. ref'd)............................35

*Garcia v. State*,
    No. 14-06-00570-CR, 2007 WL 2447301 (Tex. App.--Houston
    [14th Dist.] Aug. 30, 2007, pet. ref'd) (not designated for publication) ......................18

*Gardner v. State*,
    306 S.W.3d 274 (Tex. Crim. App. 2009) ..............................................................31, 35

*Gardner v. State*,
    733 S.W.2d 195 (Tex. Crim. App. 1987) ......................................................................35

*Geisberg v. State*,
    945 S.W.2d 120 (Tex. App.--Houston [1st Dist.] 1996), *aff'd*,
    984 S.W.2d 245 (Tex. Crim. App. 1998) ......................................................................13

*Heller v. State*,
    279 S.W.3d 823 (Tex. App.--Amarillo 2008, no pet.) ..................................................13

*Hollins v. State*,
805 S.W.2d 475 (Tex. Crim. App. 1991) ...................................................................... 13

*Howell v. State*,
175 S.W.3d 786 (Tex. Crim. App. 2005) ...................................................................... 12

*Jenkins v. State*,
912 S.W.2d 793 (Tex. Crim. App. 1993) ...................................................................... 22

*Johnson v. State*,
No. 05-94-01743-CR, 1996 WL 253345 (Tex. App.--Dallas May
13, 1996, pet. ref'd, untimely filed) (not designated for publication) ........................ 36

*Lesso v. State*,
295 S.W.3d 16 (Tex. App.--Houston [1st Dist.] 2009, pet. ref'd) .............................. 22

*Lyssy v. State*,
429 S.W.3d 37 (Tex. App.--Houston [1st Dist.] 2014, no pet.) ................................... 16

*May v. State*,
139 S.W.3d 93 (Tex. App.--Texarkana 2004, pet. ref'd) ............................................ 13

*Mendoza v. State*,
443 S.W.3d 360 (Tex. App.--Houston [14th Dist.] 2014, no pet.) .............................. 17

*Miller v. State*,
312 S.W.3d 162 (Tex. App.--Fort Worth 2010, no pet.) .............................................. 17

*Mims v. State*,
434 S.W.3d 265 (Tex. App.--Houston [1st Dist.] 2014, no pet.) ................................. 17

*Neal v. State*,
108 S.W.3d 577 (Tex. App.--Amarillo 2003, no pet.) ................................................. 14

*Perillo v. State*,
758 S.W.2d 567 (Tex. Crim. App. 1988) ...................................................................... 35

*Robinson v. State*,
989 S.W.2d 456 (Tex. App.--Houston [1st Dist.] 1999, pet. ref'd) ............................. 36

*Runnels v. State*,
193 S.W.3d 105 (Tex. App.--Houston [1st Dist.] 2006, no pet.) ................................. 14

*Sattiewhite v. State*,
786 S.W.2d 271 (Tex. Crim. App. 1989) ...................................................................... 36

*Schuster v. State*,
435 S.W.3d 362 (Tex. App.--Houston [1st Dist.] 2014, no pet.) .................................. 13

*Unkart v. State*,
400 S.W.3d 94 (Tex. Crim. App. 2013) ................................................24, 26, 27, 29, 30

*Williams v. State*,
622 S.W.2d 116 (Tex. Crim. App. 1981) .................................................................... 36

*Woodal v. State*,
350 S.W.3d 691 (Tex. App.--Amarillo 2011, no pet.) ............................................ 34, 35

*Wright v. State*,
374 S.W.3d 564 (Tex. App.--Houston [14th Dist.] 2012, pet. ref'd) ........................... 14

*Yazdchi v. State*,
428 S.W.3d 831 (Tex. Crim. App. 2014) .................................................................... 13

**STATUTES**

TEX. CODE CRIM. PROC. ANN. art. 36.28 (West 2006) ....................................................... 11

**RULES**

Tex. R. App. P. 33.1 ......................................................................................... 24, 34

TEX. R. APP. P. 39.7............................................................................................................i

Tex. R. App. P. 44.2 ............................................................................................... 30

**TO THE HONORABLE COURT OF APPEALS:**

## STATEMENT OF THE CASE

Appellant was charged by indictment with the offense of murder. (CR 2). After the jury found appellant guilty of the charged offense, the judge sentenced appellant to life confinement. (CR 144).

## STATEMENT OF FACTS

Ochelata Reliford moved into an apartment complex located at 9700 Court Glen on June 2, 2006. (RR V 172). He lived in a first-floor apartment and he quickly befriended Ciarra, the woman who lived upstairs from him. (RR IV 177-178; RR V 141, 173-174, 206). Reliford also met appellant within a week of having moved into the apartment complex. (RR V 174-175). Appellant, who was known as "Red," was Ciarra's boyfriend and lived with her in the upstairs apartment. (RR V 174). Reliford saw appellant "going and coming often" and had conversations with him on occasion. (RR V 207-208). The complainant lived in a nearby first-floor apartment that was within view of both Reliford's apartment and appellant's apartment. (RR IV 124, 190-191, 215-218; RR VIII – SX 16, DX 1).

On the day of the murder, August 3, 2006, Reliford had the day off from his job as a social worker for the Texas Health and Human Services Commission. (RR V 173, 176). So he stayed home intending to relax. (RR V 177). He went outside

on his patio at about 10:30 a.m. and saw appellant, Ciarra, the complainant, and a couple of other men at the complainant's apartment. (RR V 177-178). They were having a heated discussion about the complainant owing appellant money. (RR V 178).

When Reliford left his apartment to go to the store at about 4:30 p.m., he saw the complainant outside washing his car. (RR V 178-179). Appellant and appellant's friend, Carnell Meredith (aka Slim), were arguing with the complainant. (RR IV 32-33; RR V 47). The complainant slammed his car door and walked back toward his apartment, with appellant and Meredith following him. (RR V 179). Reliford also saw appellant fighting with his girlfriend throughout the day. (RR V 180). Reliford overheard her tell appellant "you're stupid" and "don't do it." (RR V 180).

At about 10:30 p.m., Reliford walked a visiting friend, Trancquena Johnson, out to her car. (RR V 181-184). Once outside, Reliford heard appellant and Ciarra arguing. (RR V 185). Ciarra was standing by her door and appellant was standing in the middle of the stairway, with two men standing behind him. (RR V 185-188). Reliford got a good look at appellant and recognized him. (RR V 148). Ciarra, who was crying, called appellant stupid and told him "don't." (RR V 188, 231). Appellant stopped arguing with Ciarra and walked down the stairs with his two companions following. (RR V 188, 231, 238-239).

2

Reliford watched appellant walk to the complainant's apartment, knock on the door (which was illuminated by a porch light), and turn the door knob. (RR V 189-190, 237). Appellant's two companions were standing behind him. (RR V 237). There were also several other men standing off to the side. (RR V 237-238). Reliford did not know where these men came from. (RR V 237-238).

Appellant took a few steps into the complainant's apartment where the complainant met him. (RR V 190). Appellant pulled out a gun and shot the complainant in the head. (RR V 190). Appellant fired the gun three or four times. (RR V 191). Appellant's back was to Reliford when the shots were fired, but Reliford had no doubt that appellant was the shooter. (RR V 191). Reliford explained that he watched appellant the entire time from when appellant walked down the stairs until the shots were fired. (RR V 191-192, 230). He never took his eyes off of appellant. (RR V 191-192).

Reliford continued to watch appellant as appellant ran back in the direction from which he had come and ran past the stairway to his apartment. (RR V 193-194). In other words, appellant was running toward Reliford. (RR V 242-243). Appellant had a gun in his hand. (RR V 243). Appellant's two companions followed him as he fled. (RR V 195). Reliford looked at appellant as he ran past. (RR V 195).

Reliford recalled that no one other than appellant appeared to participate in the murder. (RR V 240). Reliford did not see any of the other men in possession of a gun. (RR V 239).

When the police arrived at the scene on the night of the offense, Reliford did not speak to them because he was scared. (RR V 196). However, he contacted the police about a month later and provided a written statement at the police station. (RR V 197-198). He also viewed several photospreads. (RR V 198). Reliford identified Meredith and Ciarra's brother as being present when the shooting occurred. (RR V 195-202). He identified appellant as the shooter. (RR V 199-200).

Trancquena Johnson, the friend who was visiting Reliford on the night of the murder, also identified appellant as the shooter. Johnson recalled that Reliford and appellant lived in the same apartment building, with appellant living upstairs from Reliford. (RR IV 177-178). Before the day of the murder, she had seen appellant and was able to recognize him, but had not met him. (RR IV 152-156, 199).

On the night of the murder, Johnson arrived at Reliford's apartment at about 8:00 p.m. (RR IV 157). About an hour later, Johnson went outside and saw the complainant, appellant, another man, and a female arguing near the complainant's apartment. (RR IV 157-158, 181). She recognized appellant at this time. (RR IV 204). Johnson returned inside Reliford's apartment, but left again a short while later. (RR IV 159-160).

While standing at her car preparing to leave, Johnson had a clear view of the complainant's apartment. (RR IV 160-162). She saw the same four people arguing. (RR IV 162-163). While standing right in front of the complainant's door, appellant raised a gun and fired it at least three times. (RR IV 163-164). Appellant then ran past Johnson with a gun in his hand. (RR IV 165, 195, 207, 211-212). She got a good look at appellant and recognized him from having seen him on previous occasions. (RR IV 165-167). According to Johnson, appellant was wearing a black T-shirt. (RR IV 165-166). Appellant's male companion was wearing a white T-shirt and he ran the opposite direction. (RR IV 166-168).

A third person witnessed a portion of this confrontation. Maria Coronado lived in the upstairs apartment next to appellant's apartment. (RR IV 212-216). On the night of the murder, she looked out her window and saw appellant and another man, Meredith, arguing with the complainant at the complainant's apartment. (RR IV 32, 217-219, 227). She got a good look at appellant. (RR IV 221). After they argued for several minutes, appellant and Meredith went upstairs and then went "right back downstairs" to the complainant's apartment (RR IV 219-221). Coronado then heard four or five gunshots and saw appellant and Meredith run away. (RR IV 220-221). She did not see who fired the shots. (RR IV 220).

Brandon Lusk, another resident of the apartment complex, witnessed a portion of the confrontation. (RR IV 122-123). Lusk recalled that he was walking

5

through the apartment complex toward his apartment when he saw the complainant, whom he knew, standing outside with a tall, older, dark-skinned male who was wearing a white T-shirt and jeans. (RR IV 124, 126-127 141). There was no one else present. (RR IV 141-142). The complainant had just had an argument with someone and was agitated, but he was not agitated with the tall, older man. (RR IV 141). Lusk asked the complainant what was wrong and the complainant indicated he had to "teach these young people respect." (RR IV 127). Lusk jokingly told the complainant not to shoot anybody and the complainant smiled and laughed. (RR IV 127). Lusk then continued to his apartment. (RR IV 127-129).

About three minutes after he arrived home, Lusk heard three gunshots. (RR IV 129-130). But he did not witness the shooting. (RR IV 132). He looked outside and saw a light-skinned young man walking toward him from the direction of the complainant's apartment. (RR IV 129-132). The young man was carrying a pistol in his left hand and was wearing shorts and black T-shirt. (RR IV 129, 132). Lusk was unable to see his face and therefore could not identify appellant in court. (RR IV 132, 134-135).

## SUMMARY OF THE ARGUMENTS

Point one:  An appellate complaint about a read-back procedure must be preserved by a comporting trial objection. Appellant lodged a specific objection in

6

the trial court to the judge's reading back of Johnson's testimony. None of his appellate complaints about the read-back process comport with his trial objection. Absent comportment between his trial objection and appellate contentions, appellant presents nothing for review.

Point two: The trial judge did not err in denying appellant's motion to suppress Reliford's in-court identification of appellant as the shooter. Even assuming the pretrial identification procedure was impermissibly suggestive, there is not a very substantial likelihood that an irreparable misidentification resulted. Reliford's identification of appellant was reliable, despite any impermissibly suggestive identification procedure, because Reliford had a very good opportunity to view appellant during the offense and he paid a high level of attention to appellant at that time. Furthermore, Reliford was very confident of his identification of appellant when he viewed the photo array. Also, Reliford's ability to identify appellant was not compromised by the passage of time between the murder and the viewing of the photospread. It was also very unlikely that Reliford would mistakenly identify appellant as the shooter since he was familiar with appellant, having known him as a neighbor for about two months before the commission of the murder. Finally, Reliford confirmed his in-court identification of appellant was made based on having observed him at the time of the offense and, therefore, was independent of the pretrial identification procedure.

Point three:   By failing to lodge a trial objection, appellant waived any error in the trial judge's comment about appellant looking like a thug.  Appellant's reliance on *Blue* to excuse his failure to object is misplaced because *Blue* is a plurality opinion with no precedential value.  Furthermore, *Blue* is not applicable because the facts of that case differ significantly from those in this case.

Point four:   The trial judge did not err when he personally questioned a venireman about his ability to follow the law or when he denied appellant's challenge for cause against this venireman.  The venireman provided the defense attorney equivocating answers about his ability to afford appellant a fair trial.  In such a circumstance, a trial judge may personally pose questions to the venireman to clarify his answers.  And once the venireman confirmed that he could follow the law, the trial judge did not err in denying appellant's challenge for cause.

## REPLY TO POINT OF ERROR ONE

In his first point of error, appellant contends the trial judge failed to properly interpret and respond to the jurors' request to have some disputed testimony read back to them.  He maintains this failure resulted in harmful reversible error.

### 1.  Relevant facts

During their guilt-innocence deliberations, the jurors asked the judge to provide them with "all transcripts of the case." (CR 133).  In response, the judge

8

provided the jury with a frequently used Harris County form designed for such circumstances which reads as follows:

> MEMBERS OF THE JURY:
>
> In view of your request for certain testimony, I instruct you as follows:
>
> "If the jury disagrees as to the statement of any witness, they may, upon applying to the Court, have read to them from the court reporter's notes that part of such witness' testimony, or the particular point in dispute, and no other."
>
> In accordance with this rule, you are instructed that a request to have the court reporter's notes read cannot be complied with unless the jury disagrees as to the statement of the witness. Therefore, it will be necessary for you to certify that you are in disagreement as to the statement of a witness, and you should request that part of the witness' statement or point in dispute and only that part or point which is in dispute. Please fill in the form below and have your foreman sign the same.

(CR 134).

The form then asks the jurors to identify the "Name of witness whose statement is subject to disagreement." The jurors answered "Tranquena Johnson." The form's second inquiry asks for the identification of the "Lawyer questioning witness at time of the statement." The jurors answered "State." Finally, the form asks the jurors to identify the "Statement in dispute." The jurors answered: "With respect to the people outside [the complainant's] apartment immediately prior to

9

the shooting, we are in dispute as to the number of people present and the respective colors of their shirts." (CR 134).

Upon receiving this completed form from the jurors, the judge summoned them to the courtroom and confirmed their disagreement about the identified testimony. (RR VI 92). The following testimony from Johnson was then read back to the jurors:

> Q: Then, what happened?
>
> A: And as I was getting them from the car, the defendant ran past me.
>
> Q: What did you notice about him, as he ran by?
>
> A: I noticed him because of me seeing him prior. And there's nothing specific that I noticed. What he was wearing and that, you know, I had seen him before.
>
> Q: What was he wearing?
>
> A: A black T-shirt. I don't really remember shoes or anything like that.
>
> * * * * *
>
> Q: So there were four people total that you saw outside that apartment?
>
> A: Yes.
> * * * * *
>
> Q: And as you're looking there, how many people can you see standing there arguing?
>
> A: Four.

(RR VI 93). This read-back testimony was compiled by gathering three different portions from Johnson's testimony. Two excerpts are found in her direct testimony, while the third was taken from her testimony on cross-examination. (RR IV 158, 165, 184).

After this testimony was read back to the jurors, they retired for further deliberations. (RR VI 93). None of the jurors expressed any dissatisfaction with the selection of read-back testimony. After the jury left the courtroom, appellant's attorney made the following objection to the read-back process: "What I wanted to object to was I wanted there to be the inclusion of any testimony and not just in direct, but to also add anything from cross and any type of redirect, any issue under the cross-examination or direct of Trancquena Johnson relating to the number of people. I ask that it be included in its entirety." (RR VI 94). Defense counsel then stated, and the judge agreed, that counsel had made this same objection before the read-back and that the judge had overruled it. (RR VI 94).

## 2. Argument and authority

### 2.1 Applicable law

If jurors disagree about the testimony of any witness, the jury may ask the trial court to "have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other…" TEX. CODE CRIM. PROC. ANN. art. 36.28 (West 2006); *Arnold v. State*, 234 S.W.3d 664, 676

11

(Tex. App.--Houston [14th Dist.] 2007, no pet.). After determining that the jurors dispute a portion of testimony, the trial judge must strike a balance between reading too much or too little testimony in response to the jury's request. *Arnold*, 234 S.W.3d at 676. A trial judge's ruling under article 36.28 should not be disturbed on appeal unless a clear abuse of discretion and harm is shown. *Howell v. State*, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005).

2.2 Appellant's specific contentions

On appeal, appellant raises a number of complaints about the trial judge's handling of the read-back procedure. First, appellant complains about the boilerplate form that the judge provided the jurors. (CR 134). He claims it is misleading because it requires the jury to narrow its request to the testimony of a single witness under examination by a single lawyer. (appellant's brief, p. 13). He maintains that article 36.28 does not require such a request be limited to a single witness's testimony or a single lawyer's examination. (appellant's brief, p. 16).

Second, appellant contends the trial court's read-back provided the jury with an incomplete portion of testimony. (appellant's brief, p. 13). Appellant argues the judge should have responded to the jury's request by providing them with Reliford's testimony about the number of people present near the complainant's apartment at the time of the shooting. (appellant's brief, p. 18; RR V 195). Appellant further argues that the judge should have read back a portion of

12

Johnson's testimony on cross-examination describing the clothing of some of the people present. (appellant's brief, p. 19; RR IV 184-185).

Third, appellant claims the judge's read-back exceeded the scope of the jury's request because it included Johnson's testimony about appellant running past her. (appellant's brief, p. 19; RR IV 165). Appellant argues this testimony was irrelevant to the requested description of the parties.

## 2.3 Preservation

It is well established that complaints about error in the reading back of testimony pursuant to article 36.28 must be preserved by objection at the time of the reading. *Hollins v. State*, 805 S.W.2d 475, 476 (Tex. Crim. App. 1991); *Heller v. State*, 279 S.W.3d 823, 825 (Tex. App.--Amarillo 2008, no pet.); *May v. State*, 139 S.W.3d 93, 100 (Tex. App.--Texarkana 2004, pet. ref'd); *Geisberg v. State*, 945 S.W.2d 120, 125 (Tex. App.--Houston [1st Dist.] 1996), *aff'd*, 984 S.W.2d 245 (Tex. Crim. App. 1998). The purpose of a timely objection is to give the trial judge the opportunity to cure the error. *Hollins*, 805 S.W.2d at 476; *Schuster v. State*, 435 S.W.3d 362, 366 (Tex. App.--Houston [1st Dist.] 2014, no pet.).

Furthermore, the point of error on appeal must comport with the objection made at trial. *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014). An objection based on one legal theory in the trial court may not be used to support a different theory on appeal. *Wright v. State*, 374 S.W.3d 564, 575 (Tex. App.--

Houston [14th Dist.] 2012, pet. ref'd). The reason for requiring the trial objection to comport with the appellate complaint is to give the trial judge the opportunity to rule on the particular legal theory advanced by the defendant. *Runnels v. State*, 193 S.W.3d 105, 108 (Tex. App.--Houston [1st Dist.] 2006, no pet.). When the appellate complaint fails to comport with the trial objection, nothing is preserved for review. *Id*. This comportment requirement applies to read-back issues raised under article 36.28. *Neal v. State*, 108 S.W.3d 577, 579 n.2 (Tex. App.--Amarillo 2003, no pet.).

Appellant's trial objection to the read-back procedure was very specific. He argued that the read-back of Johnson's testimony should have been expanded to include any testimony by Johnson on cross-examination or redirect examination "relating to the number of people." (RR VI 94). At the trial level, appellant made none of the complaints he makes on appeal. At trial, appellant did not complain about the nature of the boilerplate read-back form itself. He did not request that Reliford's testimony about the number of people present at the complainant's apartment be read back. He did not request the reading of Johnson's testimony on cross-examination describing the clothing of the people present. Nor did he complain that the read-back exceeded the scope of the jury's request. Furthermore, on appeal, appellant does not complain of the matter he raised in his trial objection

14

(i.e., failing to provide Johnson's cross-examination and redirect testimony about the number of people present).

Accordingly, appellant's appellate contentions fail to comport with his trial objection. As such, he presents nothing for review. Point of error one is meritless and should be overruled.

<u>**REPLY TO POINT OF ERROR TWO**</u>

In his second point of error, appellant contends the trial judge erred by denying his motion to suppress Reliford's in-court identification of him. (CR 114; RR V 168-169, 174-175, 189-190; RR VI 12). Appellant maintains that Reliford's in-court identification of him was tainted by a impermissibly suggestive pretrial identification procedure.

1. <u>Relevant facts</u>

After appellant became a suspect in the murder, Sergeant Jon Brooks created a six-man photo array in which appellant's photograph occupied the number three position. (RR IV 12-14; RR VIII – SX 66). He showed the photospread to Johnson who identified appellant as the man who shot and killed the complainant. (RR IV 17). The officer instructed Johnson to sign the corresponding number three slot on the back of the photo array. (RR IV 202-1; RR VIII – SX 67). Two other witnesses identified appellant, in some capacity, in this photo array and also signed the number three slot below Johnson's signature. (RR IV 26, 29-30; RR VIII – SX 67).

15

Thereafter, Reliford looked at the photo array and identified appellant in the number three position. (RR IV 35-36). Sergeant Brooks described Reliford's pretrial identification as follows: "He said that's Red, that's the person that shot the victim Keith, that he ran past him with the gun in his hand and he looked right at him and he was positive that Red was the person that shot and killed Keith." (RR IV 36). After he identified appellant, Reliford signed the photo array below the other three signatures. (RR VIII – SX 67).

At the suppression hearing, Sergeant Brooks allowed that permitting Reliford to see the other three signatures attached to the number three position after he identified appellant in the photo array could have served as some measure of confirmation to Reliford of his previously made identification of appellant in the number three position. (RR IV 56-59).

## 2. Standard of review

A trial judge's ruling on a suppression motion is reviewed under a bifurcated standard of review. *Lyssy v. State*, 429 S.W.3d 37, 42 (Tex. App.--Houston [1st Dist.] 2014, no pet.). While an appellate court shows almost total deference to the trial judge's determinations of historical fact, it reviews the trial judge's application of the law to the facts de novo. *Id*. The trial judge's ruling will be upheld on appeal if the ruling is reasonably supported by the record and is correct on any theory of law applicable to the case, even if the trial judge gave the wrong reason

16

for his ruling.  *Id.*; *Miller v. State*, 312 S.W.3d 162, 165 (Tex. App.--Fort Worth 2010, no pet.).

An appellate court reviews de novo the question of whether a pretrial identification procedure amounted to a denial of due process.  *Mendoza v. State*, 443 S.W.3d 360, 363 (Tex. App.--Houston [14th Dist.] 2014, no pet.).  The defendant bears the burden of showing by clear and convincing evidence that the procedure was impermissibly suggestive.  *Mims v. State*, 434 S.W.3d 265, 272 (Tex. App.--Houston [1st Dist.] 2014, no pet.).

3.  Argument and authority

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law.  *Barley v. State*, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995); *Mendoza*, 443 S.W.3d at 363.  Appellate courts use a two-step analysis to determine the admissibility of an in-court identification: (1) whether the out-of-court identification procedure was impermissibly suggestive; and (2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification.  *Barley*, 906 S.W.2d at 33.  This analysis requires an examination of the totality of the circumstances surrounding the particular case and determination of the reliability of the identification.  *Id.*

17

Regarding the first step of the analysis, there is some indication that providing a witness such as Reliford the opportunity to learn that other witnesses have identified the same person in a photo array may be impermissibly suggestive. *Garcia v. State*, No. 14-06-00570-CR, 2007 WL 2447301, at \*2 (Tex. App.--Houston [14th Dist.] Aug. 30, 2007, pet. ref'd) (not designated for publication) (and cases cited therein). However, assuming appellant satisfied the first step, he cannot satisfy the second.

The second step requires an appellate court to determine whether a very substantial likelihood for irreparable misidentification was created by the suggestive procedure. *Barley*, 906 S.W.2d at 34. Reliability is the linchpin in determining the admissibility of such identification testimony. *Id*. If indicia of reliability outweigh suggestiveness, an identification is admissible. *Id*. To obtain a reversal, a defendant must show by clear and convincing evidence that the identification has been irreparably tainted. *Id*.

In determining whether there is a very substantial likelihood for irreparable misidentification, an appellate court considers the following five non-exclusive factors: (1) the witness's opportunity to view the criminal act; (2) the witness's degree of attention; (3) the accuracy of the suspect's description; (4) the level of certainty at the time of confrontation; and (5) the time between the crime and the confrontation. *Barley*, 906 S.W.2d at 34-35.

18

Regarding the first and second factors, Reliford had a good opportunity to view appellant during the criminal act and he focused a high level of attention on appellant at the time of murder. On the day of the murder, Reliford saw appellant arguing with his girlfriend and with the complainant several different times throughout the day. (RR V 144-147, 176-180). Later that night, right before the murder, Reliford went outside his apartment and saw appellant standing on the stairway arguing with his girlfriend. (RR V 147-148). Reliford focused his attention on appellant because of his fight with his girlfriend. (RR V 149). Appellant was facing Reliford. (RR V 148). Reliford confirmed he got "a good look" at appellant. (RR V 148). He recognized appellant since appellant lived above him. (RR V 141-142). Reliford had met appellant about two months before the date of the murder. (RR V 144, 172-175). During this two-month period, Reliford had often seen appellant "going and coming" and had had conversations with appellant. (RR V 207-208).

Following appellant's argument with his girlfriend, Reliford watched appellant walk down the sidewalk toward the complainant's apartment. (RR V 149). He saw appellant knock on the complainant's door and shoot the complainant once he emerged. (RR V 149). Reliford stated that appellant's back was turned when he fired the gunshots, but he explained that he did not lose sight of appellant from the time he walked down the stairs until he reached the

19

complainant's apartment. (RR V 150). Following the shooting, Reliford continued to keep his eye on appellant, without losing sight of him, as appellant ran past him with a gun in his hand. (RR V 150). Reliford looked at appellant as he ran past him. (RR V 195).

Given the totality of these circumstances, Reliford had an excellent opportunity to view appellant before, during, and after the murder. The record also demonstrates that Reliford focused a very high degree of attention on appellant during the murder, as well as immediately before and after the murder. As such, the first two factors militate in finding that any impermissibly suggestive identification procedure did not give rise to a very substantial likelihood of irreparable misidentification.

Regarding the third factor, Reliford did not provide a statement on the night of the offense; he did not talk to the police until about a month later. (RR V 160, 196-198). So, it appears he did not provide a description of the suspect. Accordingly, this factor is neutral.

The fourth factor examines the level of certainty demonstrated by the witness at the time of confrontation. When Reliford looked at the photo array he told Sergeant Brooks: "… that's Red, that's the person that shot the victim Keith, that he ran past him with the gun in his hand and he looked right at him and *he was positive that Red was the person that shot and killed Keith*." (RR IV 35-36).

20

Appellant's expressed high level of certainty would be expected since he had known appellant for about two months at the time of the murder and he focused intently on appellant during the murder's commission. Given the confident nature of Reliford's identification of appellant to Sergeant Brooks, this factor favors the admissibility of Reliford's in-court identification.

The fifth factor considers the time between the crime and the confrontation. About one month separated the commission of the offense from the identification procedure. (RR V 176, 197-198). Given Reliford's pre-existing familiarity and acquaintance with appellant, coupled with his intent focus on appellant during the commission of the murder, this passage of time did not diminish Reliford's ability to accurately identify appellant. *Barley*, 906 S.W.2d at 35 (twelve-month delay did affect witnesses' recollection or identification of suspect). Accordingly, this factor also favors the admissibility of Reliford's identification of appellant.

In addition to these five non-exclusive factors, there are additional circumstances indicating that the suggestive procedure, if any, did not create a very substantial likelihood of irreparable misidentification. For example, Reliford and appellant had been neighbors for about two months before the murder. (RR V 141-144, 172-175). During this two-month period, Reliford had often seen appellant "going and coming" and had had conversations with appellant. (RR V 207-208). Since Reliford knew appellant before the offense, the possibility of

21

misidentification was minimal. *Jenkins v. State*, 912 S.W.2d 793, 808-09 (Tex. Crim. App. 1993) (opin. on reh'g).

Furthermore, it is well settled that even when a pretrial identification procedure is impermissibly suggestive, in-court testimony of an identification witness will still be admissible as long as the record clearly reveals that the witness's prior observation of the accused was sufficient to serve as an independent origin for the in-court identification. *Lesso v. State*, 295 S.W.3d 16, 25 (Tex. App.--Houston [1st Dist.] 2009, pet. ref'd). Reliford testified that his in-court identification was based on having observed appellant kill the complainant. (RR V 155-156). Reliford's confirmation that his in-court identification was independent of the photo array is to be expected since he knew appellant before the shooting, he intently watched appellant during the shooting, and he identified appellant in the photo array before he was exposed to any suggestiveness resulting from his subsequently being shown the signatures of the other witnesses who identified appellant in the photo array.

Considering this collection of factors and circumstances, appellant has failed to show by clear and convincing evidence that Reliford's in-court identification was irreparably tainted by a suggestive identification procedure. As such, the trial judge did not abuse his discretion by denying appellant's motion to suppress. Point of error two is meritless and should be overruled.

## REPLY TO POINT OF ERROR THREE

In his third point of error, appellant contends the trial judge erred during voir dire by agreeing with a venireperson who said appellant looked like a thug. (RR II 133). Appellant argues the judge's comment violated his presumption of innocence and deprived him of an impartial jury.

### 1. Relevant facts

Near the conclusion of his voir dire examination of the venire panel, defense counsel asked the veniremembers whether there was anything that would prevent them from holding the State to its burden of proof and affording appellant a fair trial, such as appellant's appearance. (RR II 130-131). Juror number 25, Daryl Taylor, stated that he probably could not give appellant a fair trial. (RR II 132-133). When asked if he would hold the State to its burden of proof, Taylor replied, "No, I would hold the State to their burden, but I don't think I could give him a fair trial." (RR II 132). Defense counsel posed no further questions to this potential juror. (RR II 132).

After defense counsel concluded his examination of the venire panel, the judge excused the veniremembers from the courtroom, with the exception of Taylor. Taylor approached the bench and the following exchange occurred:

> Judge: You said based on his looks you could not give him a fair trial?
>
> Taylor: Yes, sir.

23

Judge: But you also said that you could follow the law and you said you would hold the State to its burden of proof of beyond a reasonable doubt?

Taylor: Yes. Just based on his looks alone, he looks like a thug.

Judge: That's fine. I don't disagree with that. In fact, I agree with that. The question is, can you follow the law and hold the State to its burden of proof and listen to the evidence?

Taylor: Yes, I can.

Judge: That's all we need to know, sir. I appreciate your time.

(RR II 133-134). Following a discussion at the bench, the judge announced, "All right. He's in." (RR II 134).

## 2. Argument and authority

As mentioned, appellant claims the trial judge erred by referring to him as a "thug." Ordinarily, a complaint regarding an improper judicial comment must be preserved at trial by a timely objection. *Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013); Tex. R. App. P. 33.1. Appellant failed to object when the judge agreed with the venireman's observation that appellant looked like a thug. (RR II 133-134). Absent a timely objection, appellant presents nothing for review and his point of error should be overruled.

Nevertheless, appellant argues that a judge's comment that taints the accused's presumption of innocence amounts to fundamental error that requires no preserving objection. In support of this claim, appellant relies on *Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000).

The trial judge in *Blue*, at the beginning of the voir dire process, apologized to the group of prospective jurors for a long delay, telling them that the defendant was still deciding whether to accept the State's plea offer or go to trial. *Blue*, 41 S.W.3d at 130. The judge also told the group of potential jurors, "I prefer the defendant to plead," and "[We] were all trying to work toward that and save you time and cost of time." *Id.* The defendant did not object to any of the judge's comments. *Id.*

On appeal, the defendant argued that no objection is required when the trial judge makes a fundamentally erroneous statement. *Id.* A plurality of the court of criminal appeals ruled that the judge's comments tainted the defendant's presumption of innocence in front of the venire. *Id.* at 132. The plurality further held that such comments amounted to fundamental error of constitutional dimension and required no objection. *Id.*

In a concurring opinion, Judge Keasler stated that the trial judge's comments were so egregious as to demonstrate a lack of impartiality. *Blue*, 41 S.W.3d at 138 (Keasler, J., concurring). Judge Keasler then concluded that a violation of the right

to an impartial judge is a structural error that cannot be forfeited by the failure to object. *Id*. at 138-39.

Given the plurality status of the *Blue* opinion, its precedential value has been called into question over the years. *Unkart*, 400 S.W.3d at 99-100. The court of criminal appeals recently addressed this issue and ruled that "the *Blue* opinion has no precedential value":

> With respect to *Blue*, it is not possible to ascertain a majority holding or the narrowest ground or rule that commands a majority of the court. The rationales of the plurality and concurring opinions are entirely disparate: they did not even focus on the same error, much less give the same reason why it was error. The plurality focused on the effect of the trial judge's comments on the jury, while Judge Keasler considered the comments merely as evidence that the trial judge was biased.

*Unkart*, 400 S.W.3d at 101. While stripping *Blue* of any precedential value, the court did hold that the opinions in the *Blue* case nevertheless may be considered for any persuasive value they may have, in the same way as any other opinion that does not command a majority of the court, such as a concurring opinion. *Id*. Therefore, to the extent that appellant relies on *Blue* to excuse his failure to object for preservation purposes, his claim is not supported by controlling authority.

Moreover, whatever persuasive value this Court may attach to the *Blue* opinions, they do not warrant a reversal in appellant's case because the circumstances in his case significantly differ from those in *Blue*. *See Unkart*, 400

26

S.W.3d at 101-02. First, the *Blue* plurality focused on the effect of the trial judge's comments on the jury. *Id*. at 101. In *Blue*, the judge made his comments to the venire at the outset of the voir dire process. *Blue*, 41 S.W.3d at 130. As such, the particular veniremembers who were ultimately placed on the jury heard the judge's comments vitiating Blue's presumption of innocence. In other words, the actual jurors were tainted by the judge's comments.

In contrast, the judge in appellant's case made the complained-of comment only to juror number 25. The record reflects that the judge excused the venire with the exception of Taylor (prospective juror number 25). (RR II 133). Taylor then approached the bench where the complained-of discussion occurred in which the judge agreed with Taylor's assessment that appellant looked like a thug. (RR II 133).

Accordingly, unlike the situation in *Blue*, the judge made the complained-of comment to a single veniremember. And this veniremember, Taylor, did not serve on the jury. (RR II 139-142). As such, the judge's comment did not reach any of the jurors, meaning appellant's jury was no affected in any manner by the judge's comment. This distinction is critical since the *Blue* "plurality focused on the effect of the trial judge's comment on the jury." *Unkart*, 400 S.W.3d at 101. Since the judge's comments had no effect on the actual jurors, the *Blue* plurality does not

support a finding of fundamental error nor does it excuse the absence of an objection for preservation purposes.

Second, appellant can find no relief in Judge Keasler's concurring *Blue* opinion either. Judge Keasler focused on his determination that the judge's comments revealed that he was biased against appellant, thereby depriving Blue of his right to an impartial judge. *Blue*, 41 S.W.3d at 138-39 (Keasler, J., concurring); *Unkart*, 400 S.W.3d at 101. Judge Keasler stated this deprivation was an absolute systemic error which required no objection. *Blue*, 41 S.W.3d at 138-39 (Keasler, J., concurring).

Unlike the judge's comments in *Blue*, the judge's comment in this case does not reveal a judicial bias against appellant. While the judge did agree that appellant looked like a thug, the judge also subsequently stated that he himself would "look like a thug, too" if he were to take off his shirt and roll up his sleeves.[1] (RR II 139). The judge's inclusion of himself in the category of people who look like a thug strongly indicates that he would not hold a bias against appellant for simply looking like a thug. It would seem unlikely that a judge would hold an accused in less esteem for having a quality which was shared by the judge himself.

---

[1] The judge's comment is very likely a reference to his many tattoos. http://www.chron.com/news/houston-texas/article/New-judge-says-his-former-addiction-can-help-1540561.php (news article describing a depicting the judge's tattoos).

28

Under these circumstances, the record does not demonstrate a biased judge. As such, unlike the facts in *Blue*, appellant was not denied his right to an impartial judge. Therefore, there was no structural error to excuse appellant's failure to object. An objection was required to preserve any error.

A third distinction (related to the second one above) lies in the attitudes expressed by the respective judges. In *Blue*, the judge's remarks were an expression of exasperation and impatience with how the defendant was exercising his rights. *Unkart*, 400 S.W.3d at 101 (distinguishing *Blue* on the different attitudes expressed by judges). Blue's trial judge essentially faulted the defendant for failing to quickly give up his right to a jury trial and accept a plea offer. *Id*. By contrast, appellant's judge expressed no discontent with appellant whatsoever and certainly did not criticize him for exercising any of his rights.

Fourth, the trial judge in *Blue* conveyed information about the case that the jurors would not have otherwise known. *Id*. Here, the judge simply agreed with an observation made by Taylor (who was not a juror). In other words, appellant's judge conveyed a belief to Taylor that Taylor already held.

Fifth, the trial judge in *Blue* told the jurors what he preferred the defendant to do, but the trial judge's comment in this case does not. *Id*. Blue's judge expressly informed the jurors that he preferred that Blue accept the State's plea

29

offer. *Id.* In the instant case, the trial judge did not express any unfulfilled expectations he held for appellant.

These various factors demonstrate that the instant case is very different from *Blue*. Most importantly, the factors that were deemed critical in the *Blue* opinions (i.e., a biased judge and a jury tainted by the judge's vitiation of Blue's presumption of innocence) do not exist in this case. Based on these critical distinctions, *Blue* has no bearing on appellant's case, even as persuasive authority.

Absent a biased judge or the vitiation of appellant's presumption of innocence, there was no fundamental or structural error. Absent this type of error, appellant was required to object to preserve any error. *See Unkart*, 400 S.W.3d at 102. Having failed to object, appellant presents nothing for review.

For similar reasons, appellant suffered no harm from the judge's comment. Tex. R. App. P. 44.2. As mentioned, the remark was conveyed to a single venireman who did not serve on the jury. So, even assuming the comment vitiated appellant's presumption of innocence, the judge's comment did not reach any of the jurors. As such, appellant's presumption of innocence remained untarnished and intact before the jury. Also, as mentioned, the complained-of comment, in the context of the judge's other thug-related comments, did not reveal a biased judge. Therefore, there was no harm.

Point of error three is meritless and should be overruled.

# REPLY TO POINT OF ERROR FOUR

In his fourth point of error, appellant contends the trial judge erred by denying his challenge for cause against juror number 25. (RR II 137). Appellant maintains this venireman was biased and prejudiced against him as demonstrated by this venireman's comments that appellant looked like a thug and he could not give appellant a fair trial (i.e., the comments discussed in the previous point of error). (RR II 132-134). Appellant also claims the trial judge erred by attempting to rehabilitate the venireman.

## 1. Burdens and the standard of review

A veniremember is challengeable for cause if he has a bias or prejudice against the defendant or against the law upon which either the State or the defense is entitled to rely. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Id*. Before a prospective juror may be excused for cause on this basis, the law must be explained to him, and he must be asked whether he can follow the law, regardless of his personal views. *Id*.

The proponent of the challenge for cause has the burden of establishing that the challenge is proper. *Id*. The proponent does not meet this burden until he has shown that the veniremember understood the requirements of the law and could

not overcome his prejudice well enough to follow the law. *Id.* When the record reflects that a veniremember vacillated or equivocated on his ability to follow the law, the reviewing court must defer to the trial judge's ruling. *Id.*

An appellate court reviews a trial judge's ruling on a challenge for cause with considerable deference because the trial judge is in the best position to evaluate a veniremember's demeanor and responses. *Id.* at 295-96. A trial judge's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. *Id.* at 296. When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, an appellate court affords particular deference to the trial judge's decision. *Id.*

2.  Relevant facts

During voir dire examination, the defense attorney told the veniremembers that appellant was presumed innocent and then asked whether any of them were unable to afford appellant that presumption. (RR II 131-132). The following exchange then occurred between defense counsel and juror number 25:

> Q:  Juror No. 25, you think you couldn't give him a 100 percent fair trial?
>
> A:  Probably not.
> Q:  Would you not hold the State to their burden of proof?
>
> A:  No, I would hold the State to their burden, but I don't think I could give him a fair trial.

(RR II 132). Defense counsel posed no further questions to this venireman and the venireman made no further comments during defense counsel's voir dire examination. (RR II 132-133).

After defense counsel concluded his examination of the venire panel, the judge excused all the veniremembers except for juror number 25. (RR II 133). The judge asked this venireman, Taylor, to approach the bench where the following exchange occurred:

> Judge: You said based on his looks you could not give him a fair trial?
>
> Taylor: Yes, sir.
>
> Judge: But you also said that you could follow the law and you said you would hold the State to its burden of proof of beyond a reasonable doubt?
>
> Taylor: Yes. Just based on his looks alone, he looks like a thug.
>
> Judge: That's fine. I don't disagree with that. In fact, I agree with that. The question is, can you follow the law and hold the State to its burden of proof and listen to the evidence?
>
> Taylor: Yes, I can.
>
> Judge: That's all we need to know, sir. I appreciate your time.

(RR II 133-134). Following a discussion at the bench, the judge announced, "All right. He's in." (RR II 134).

### 3. Argument and authority

As mentioned, appellant argues the trial judge should have granted his challenge for cause against juror number 25 because he expressed a bias and prejudice against appellant and said he could not give appellant a fair trial. Appellant also claims the judge erred by questioning and rehabilitating the venireman.

As a preliminary matter, appellant failed to lodge a timely objection when the judge questioned the venireman about his ability to follow the law. (RR II 133-134). By failing to timely object, appellant waived any complaint about the trial judge personally posing these questions to the venireman. Tex. R. App. P. 33.1. To preserve for appellate review a complaint about a trial judge personally questioning a prospective juror, a defendant must raise a timely objection in the trial court. *Woodal v. State*, 350 S.W.3d 691, 695 (Tex. App.--Amarillo 2011, no pet.). Absent a timely objection, appellant waived any complaint about the trial judge questioning the venireman.

Moreover, even assuming appellant had preserved for review his complaint about the judge's participation in questioning the venireman, his complaint would be meritless. Trial judges are not prohibited from intervening in the examination of a prospective juror; the trial judge's discretion will be abused only when a judge's comments are reasonably calculated to benefit the State or prejudice the

defendant. *Beets v. State*, 767 S.W.2d 711, 745 (Tex. Crim. App. 1987); *Ford v. State*, 14 S.W.3d 382, 393 (Tex. App.--Houston [14th Dist.] 2000, no pet.).

A judge may intervene with his own questions to clarify matters or determine whether the prospective juror is able to serve as a fair and impartial juror. *Gardner v. State*, 733 S.W.2d 195, 210 (Tex. Crim. App. 1987); *Woodal*, 350 S.W.3d at 695. In particular, a trial judge may question a venireperson in order to clarify his position if that venireperson has equivocated on his ability to follow the law. *Dillard v. State*, No. 14-06-00940-CR, 2007 WL 3342029, at *1 (Tex. App.--Houston [14th Dist.] Nov.13, 2007, no pet.) (not designated for publication) (citing *Gardner*, 733 S.W.2d at 210). A judge may even attempt to rehabilitate a venireperson who has expressed an unequivocal position on an issue. *Fransaw v. State*, 671 S.W.2d 539, 540 (Tex. App.--Houston [14th Dist.] 1983, pet. ref'd).

In this case, juror number 25 equivocated each time he responded to the defense attorney's question about his ability to give appellant a fair trial. The first time, the venireman said he "probably" could not give appellant a fair trial. (RR II 132). The second time, he stated, "I don't *think* I could give him a fair trial." (RR II 132). Neither answer was definitive; rather, both answers were equivocal. *Perillo v. State*, 758 S.W.2d 567, 576 n.10 (Tex. Crim. App. 1988) (an equivocating venireman is one who fails to take a firm position on an issue, answering, for example, "I think.") (citing *Williams v. State*, 622 S.W.2d 116, 121 (Tex. Crim.

35

App. 1981) (Teague, J., dissenting)); *Johnson v. State*, No. 05-94-01743-CR, 1996 WL 253345, at *3 (Tex. App.--Dallas May 13, 1996, pet. ref'd, untimely filed) (not designated for publication).

Since juror number 25's answers to the defense attorney failed to convey a firm position on his ability to give appellant a fair trial, the trial judge was entitled to follow up with his own questions and clarify the venireman's equivocal responses. In response to the judge's questions, the venireman confirmed in certain terms that he could listen to the evidence, follow the law, and hold the State to its burden of proof. (RR II 133-134). A trial judge does not err in denying a challenge for cause against a venireperson who can follow the law. *Sattiewhite v. State*, 786 S.W.2d 271, 282 (Tex. Crim. App. 1989); *Robinson v. State*, 989 S.W.2d 456, 461 (Tex. App.--Houston [1st Dist.] 1999, pet. ref'd) (if venireperson testifies unequivocally as to his ability to follow the law despite personal prejudices, trial judge does not err in denying challenge for cause; furthermore, even if venireperson vacillates on ability to follow law, trial judge does not err in denying challenge for cause).

Accordingly, since the venireman stated he was able to follow the law, the trial judge did not abuse his broad discretion in denying appellant's challenge for cause. Point of error four is meritless and should be overruled.

# CONCLUSION

It is respectfully submitted that all things are regular and the conviction should be affirmed.

**DEVON ANDERSON**
District Attorney
Harris County, Texas

/s/ Dan McCrory
**DAN McCRORY**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-5826
TBC No. 13489950
mccrory_daniel@dao.hctx.net

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing instrument has been sent to the following email address via TexFile:

Sarah V. Wood
Attorney at Law
Sarah.wood@pdo.hctx.net

/s/ Dan McCrory
**DAN McCRORY**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-5826
TBC No. 13489950

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that this computer-generated document has a word count of 8,272 words, based upon the representation provided by the word processing program that was used to create the document.

/s/ Dan McCrory
**DAN McCRORY**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-5826
TBC No. 13489950

Date: 3/26/2015