In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-21-00230-CR

**JOSE EDMUNDO ZEPEDA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-06-08435-CR**
_____

**MEMORANDUM OPINION**

Jose Edmundo Zepeda appeals his conviction for continuous sexual assault of

a child, for the sexual assault of two children K.M. (Kate), and N.M. (Nancy).[1] Tex.

Penal Code 21.02(b). Following a jury trial, Zepeda was found guilty of continuous

---

[1] We refer to the victims and their family members by pseudonyms to conceal their identity. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[.]").

sexual assault of a child as to both Kate and Nancy. He was sentenced to life imprisonment with the Texas Department of Criminal Justice. In four issues on appeal, Zepeda challenges the sufficiency of the evidence to support the conviction, the trial court's decision to allow testimony about extraneous offenses or acts under article 38.37 of the Texas Code of Criminal Procedure, and other evidentiary rulings. We affirm.

## Background

Zepeda and Kate's and Nancy's Mother were in a relationship starting in 2013. The parties were not married, but Zepeda was considered a stepfather to Mother's children. Zepeda lived with Mother, Kate, Nancy and their two other siblings in Montgomery County. In February 2016, Kate approached her Mother and told her that her stepfather was "bad." After Kate informed Mother about what she claimed Zepeda had done to her, Mother confronted Zepeda and demanded that he leave their home. Zepeda left the home and went to Louisiana, but he was later arrested in 2019 after he was charged with the continuous sexual assault of a child.

Juan Sauceda, a Sergeant with the Conroe Police Department, testified about his training as a police officer, which included training on sexual assault investigations. In February 2016, he was called to Memorial Hermann Hospital to investigate an alleged case of sexual abuse of children. Sauceda talked to Mother at the hospital, but not Kate or Nancy, explaining that he does not interview the

2

children about the allegations, but sends them to forensic interviewers trained to talk to children. Sauceda spoke to the treating nurse, Francisco Martinez. Mother told Sauceda that Kate had made an outcry the day before during dinner. She stated that her daughter was being "molested or abused by the stepfather[,]" and that Mother told Zepeda to leave the home. Kate described being touched "below the clothes." Martinez explained to Sauceda that he had examined the children when they came into the hospital, was told there were allegations of sexual molestation, and recommended a Sexual Assault Nurse Examination or a SANE. Approval was given for a SANE, and the case was then referred to a detective for further investigation.

Francisco Martinez testified he is an emergency room nurse practitioner at Memorial Hermann Southwest. He detailed his educational background, the intake and medical processes for a suspected sexual assault victim, and the events the day Mother brought Kate and Nancy to the hospital. Martinez stated that a SANE nurse is involved if the victim is a child. He described Kate as "very calm and composed and appeared to be very sincere." He said he did not get into details of the assault with the children, to not relive trauma and keep them calm. Over the objection of Zepeda's trial counsel, Martinez was allowed to testify as to what the children told him that night.

> I remember being told by [Kate] that she was touched by her stepfather; that she was undressed; and that her stepfather was undressed and he touched her. I did not elaborate on specifically how. And I asked for the timeline. [Kate] had said that some time a prior week prior to the

3

examination, which struck me was -- when I turned around, [Nancy] said that that had happened to her also.

He determined the children were not in immediate danger, received a "generalized story[,]" and wrote a statement for the police that night.

Karin Hoffman testified she is a registered nurse and that she works in the forensic department of Memorial Hermann Health Systems as a Sexual Assault Nurse Examiner (SANE). Hoffman detailed her educational background, including her training and certification to become a SANE nurse. Hoffman stated she has been performing SANE examinations for ten years on almost three hundred and fifty children. Hoffman explained her procedure in performing a SANE examination, stating that she obtains a medical history of the child, does "a complete head-to-toe exam[ination]," documenting any injuries, and performs a detailed genitalia examination. She then discusses any injuries found, safety plans going forward, and therapeutic treatments. When she interviews the child, she explains the importance of being truthful and confirms that the child knows the difference between a truth and a lie.

Hoffman's forensic reports for Kate and Nancy were admitted into evidence. The first report contained Kate's personal information, her medical history, and Kate's oral history of her sexual assault. Kate stated as follows:

> My stepfather does bad things to me. He locked me in his room when my mom is working and he is home. He touches my privates. (Points to her female genitalia area) with his private (points to male genitalia area)

mostly in the front. Sometimes in my back. (Points towards buttocks). Started when I was in the third grade. I'm in the fifth grade now. It happened about ten times. He did it to me the Sunday before last Sunday. Sometimes he holds his phone up and he has porn on it. You know, when people are having sex in a movie. He and my mom fight a lot and we left the house. We are staying with my dad. I had to tell my dad everything. I couldn't hold it in anymore.

Hoffman testified that Kate told her she was sexually assaulted multiple times, with the last assault being over a week before the examination. Kate told Hoffman that the abuse had been occurring for "approximately two years[,]" starting when she was in third grade; she was then in the fifth grade. Hoffman did not find any injuries during the examination, confirming this was not unusual, especially given the time frame since the alleged assault.

With Nancy, Hoffman repeated the same procedure of obtaining her personal information and medical history; she described Nancy's narrative of her assault.

He does bad things, stepfather. He touches me on my bottom, (points to female genitalia), with his finger. My clothes off. He did it a lot last year. Not much this year. I don't remember last time. It was a long time ago. He does it when my mother [is] at work.

She described Nancy's demeanor during the exam, stating Nancy's eyes were cast down, her voice low, and she was wringing her hands. Hoffman did not find any injuries during her examination.

Sylvie Acklin testified she was previously employed by the Conroe Police Department, and before that, she worked as a forensic interviewer of physically and sexually abused children. She explained that her job was to conduct an objective

5

"fact-finding, evidentiary-type interview of children…to obtain information from the child on a situation that they had happen[] to them or to something they had witnessed." Acklin stated that her investigation is part of a multidisciplinary team including the SANE nurses, interviewers at a child advocacy center, and involvement with the Department of Family and Protective Services, and law enforcement. She uses the statements given during these interviews as part of her investigation into the alleged sexual assault.

In 2016, Acklin received a report from Officer Sauceda about a potential allegation of sexual abuse. She gave approval for the children to receive a SANE examination and coordinated with the Department of Family and Protective Services to arrange forensic interviews for everyone in the household. When the children were interviewed by a forensic interviewer, Acklin observed the interview via closed circuit television in another room. She also went to the home of the children. At the residence, Mother told Acklin that she "kicked [Zepeda] out[]" and that he "fled to Guatemala." Ultimately, Acklin could not find Zepeda, but issued an arrest warrant for him, and Zepeda was arrested in 2019. After Zepeda's arrest, Acklin reached out to Kate and Nancy again and learned that Kate was "having suicidal ideations…self mutilation, some pretty significant depression and anxiety." According to Acklin, these symptoms are common in sexual abuse victims.

6

Daniel Pena testified he has been a specialist with SWAT and Gulf Coast Violent Offenders Task Force since about 2010. He described his background, including his training to become a SWAT specialist. He confirmed he received an arrest warrant for Zepeda for continuous sexual abuse of a child and was part of a team searching for Zepeda, but the task force could not find Zepeda.

Mayra Domingue testified she is a forensic interviewer with Children's Safe Harbor. She explained her training to become a forensic interviewer and what Safe Harbor's role is with regard to sexual assault victims. She testified that she has performed "close to 3,000 forensic interviews[,]" and detailed her process in interviewing children. In March 2016, she interviewed Kate and Nancy. During the interview, Kate identified Zepeda as the perpetrator, and stated that he touched her vagina with his hands and fingers and put his penis in her mouth. Kate told Domingue that these acts happened more than one time between third and fifth grade. According to Kate, these acts would occur on a bed in a storage room, when the other children were playing or eating and her Mother was at work. When Domingue interviewed Nancy, she followed the same interview procedures and described Nancy as more "quiet, very soft-spoken." She confirmed that Nancy also stated she was sexually abused.

Mother testified that she has lived in Montgomery County for eighteen years and has five children. She stated that Zepeda moved into her home "as my spouse"

7

in 2013, although she and Zepeda were never formally married. Her children, including Kate and Nancy, considered Zepeda to be their stepfather. Mother confirmed that in 2018 Kate was admitted to Cypress Creek Hospital. She described Kate's demeanor as "never normal" after her assault, testifying that she was "aggressive and she started to answer back. Sometimes she was sad. Sometimes she would lock herself up in her room and would not come out and then she would cut her arms and hurt herself. I think that was her way to find relief." She testified that Nancy became "very depressed, very lonely, a loner, didn't want to make friends, didn't want to talk to anyone, wanted to be far from everyone, far from all." Nancy also had thoughts of suicide, as Mother explained, "[Nancy] said that she took some pills because – only to sleep. That she did not want to harm herself. But she took a whole pill – jar of pills."

Mother described communications between herself and Zepeda after he fled her home in 2016, stating he asked for her "forgiveness" and that he "did not know why" he harmed her family. She admitted reuniting with Father "five or six months" after he left her home, and to having a sexual relationship with Father after he returned to Montgomery County, stating that she "had to do it." But Mother denied that Zepeda lived with her and her children until he was arrested. Mother confirmed she was pregnant at the time Father was arrested, and while Zepeda's name is on her child's birth certificate, she denied the baby is Zepeda's child. Mother testified she

8

feels threatened by Zepeda and that she and her daughters are in danger, although she admitted she did not immediately call the police when Zepeda returned to Texas.

Kate testified that she was sixteen at the time of trial, and that she currently attends high school. She stated that she has four siblings, including Nancy. She confirmed she understood the difference between a truth and a lie. In 2016, Zepeda was her stepfather and living with her family in Montgomery County. When Zepeda moved into her home, Kate viewed him as a father figure, stating he was "friendly" and that she wanted to "just be like him." She testified that the sexual abuse started "like a month[]" after Zepeda moved into their home. She testified that he started to kiss her on the mouth, then started to touch her private parts including her vagina, butt and breasts. Kate stated the assaults usually occurred on Sundays because "my mom went to work and he stayed[]" home. This was because Zepeda worked in landscaping and he was off on Sundays. According to Kate, the first time he sexually assaulted her, he took her to a storage room at the back of the property, told her to take off her clothes and started to touch her vagina. She said that this continued more than "one time" but it was hard to put a number to the amount of times he sexually assaulted her. Other times, he would show her pornography videos on his phone, and have her "suck his penis" and would "rub his penis on my vagina[.]" One time he tried to penetrate her vagina with his penis, but stopped because Kate said it hurt. The sexual assaults usually happened in the storage room or her Mother's room, and

9

Zepeda told her not to tell anyone about the assaults. Kate explained that she did not tell her Mother about the sexual assaults because Zepeda said he would go to jail if she told anyone. She identified Zepeda as the person who perpetrated the sexual assaults. She did not know that Zepeda was sexually assaulting Nancy. Kate said that after she told her Mother, she later attempted to commit suicide, but she got counseling. Kate denied ever seeing Zepeda again until the trial.

Nancy, who was fourteen-years old when the trial occurred, testified that she was going into high school. Nancy confirmed that she knew the difference between the truth and a lie. She stated that Zepeda was "like, my stepfather[]" and that he moved into their home when she was in kindergarten or first grade. She liked Zepeda when he first moved into the house. Nancy testified that she did not remember how long Zepeda had been living in their home after Zepeda began to touch her, but she said that his conduct began when she was in first grade. Nancy stated the first time Zepeda touched her they were in the living room of the home, they were on the couch, and Zepeda began to touch and rub her vagina with his hand. By Nancy's account, Zepeda stopped when he told her to go to her Mother's bedroom. After they went to the bedroom, Nancy said that Zepeda undressed her and put his penis in her vagina. According to Nancy, Zepeda stopped when one of her siblings knocked on the door, Zepeda stopped, and Zepeda told her not to tell anyone. She testified they engaged in penis to vagina sex more than once, explaining that on the occasions "he

10

didn't have work to do, he would stay." According to Nancy, she did not tell the hospital that Zepeda put his penis in her vagina because she "was embarrassed about it."

Nancy testified that she suspected something was happening to her sister because she observed Zepeda and Kate leave a room, and her sister did not look at her. "She avoided me. She didn't look at me. She didn't even answer." Nancy testified the first person she talked to about the sexual assault was her Mother. According to Nancy, after her Mother kicked Zepeda out of the home, she never saw him again.

Three witnesses, Ignoor Bains, Crystal Cheap, and Charlotte Payne each testified at trial and addressed Kate's and Nancy's respective psychiatric diagnosis and treatment after the alleged sexual assaults occurred. The witnesses testified about their backgrounds, general observations, and the treatments available for children who are victims of sexual assault. The notes and medical diagnoses of these healthcare professsionals were admitted into evidence. Each witness testified about their respective opinions regarding Kate's and Nancy's mental health. They testified that Kate and Nancy both received psychiatric treatment after the alleged assaults occurred.

The defense called three witnesses: Victor Cruz, Mario Zepeda, and Zepeda. Victor Cruz testified that he leased a home to Mother and Zepeda in September 2016.

11

Cruz stated that although only Mother is listed on the lease agreement, Zepeda made the payments and he lived in the home with Mother, four children, and Zepeda's brother until the spring of 2020. Cruz acknowledged that Zepeda's name did not appear on the receipts he issued for the payments he received, and he explained he didn't include Zepeda's name on the receipts based on the joint instruction he received from Zepeda and Mother. According to Cruz, Zepeda made the payments due on the lease in person. Sometimes, Cruz said, Zepeda was accompanied by the children or Mother when he paid the rent that was due on the lease. When he saw the children, Cruz said they appeared happy and when he saw Mother, she did not seem to be afraid of Zepeda.

Mario Zepeda testified that he is Zepeda's brother. He stated he was living in the home that Mother and Zepeda leased from Cruz. According to Mario, Mother went to Louisiana to get Zepeda after he left Texas, and Mother, Zepeda, the children, and Mario all lived together in the home leased from Cruz. Mario testified that the children appeared happy when he lived with them.

When Jose Zepeda testified, he denied that he molested Kate or Nancy. He stated that starting in 2013, he began living with Mother and her children, and he always treated Kate and Nancy as his stepchildren. Zepeda denied that he fled Texas after Mother confronted him about the alleged sexual abuse of her daughters. Instead, Zepeda said that he left because Mother "wanted to stick me with a knife."

12

According to Zepeda, he went to Louisiana to live with cousins "until I would figure out what was going on with her." He testified that it was Mother who later contacted him and asked him to come back to Texas, stating "she loved me and she didn't know what was going on." Zepeda told the jury that he only asked for forgiveness from Mother because "she ended up alone with all the expenses and she couldn't handle them alone." He testified there were times that he hid while living with Mother, particularly from Kate's father. He denied knowing there was a warrant out for his arrest. Zepeda also explained that he did not sign the lease because he did not have proper identification.

As a rebuttal witness, the State called Amy Vallejo, an "alternative response specialist" with the Department of Family and Protective Services. She testified that she investigates possible abuse and neglect for the Department. In February 2020, she was involved with an investigation into Mother, Zepeda, Kate and Nancy. She had received information that Mother had given birth to a child with the last name of Zepeda, so she led an investigation to determine whether the baby and Zepeda lived in the same home. She stated her focus was to determine whether Zepeda was still living in the household with Kate and Nancy. She spoke to Mother and the children, but described Mother as "[n]ot that forthcoming[,]" which led her to get a court order that required Mother to participate in family services. According to

Vallejo, she could not conclude "beyond a reasonable doubt" that Zepeda lived in the home.

At the end of trial, the jury found Zepeda guilty of continuous sexual abuse of a child. Zepeda waived his right to have the jury decide his punishment, and following a punishment hearing, the trial court ordered Zepeda to serve a life sentence in the Texas Department of Criminal Justice. Zepeda timely appealed.

## Sufficiency of the Evidence

In his brief, Zepeda challenges the sufficiency of the evidence to support his conviction. Specially, Zepeda argues that the evidence is not enough to establish that the abuse happened during a duration of thirty or more days and that as to the two alleged victims he committed two or more acts of sexual abuse.

## Standard of Review and Applicable Law

We review the sufficiency of the evidence to support a conviction under the standard in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Under that standard, we review all the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 318-19). "The jury is the sole judge of credibility and weight to be

attached to the testimony of witnesses." *Id*. We give full deference to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We may not substitute our judgment for that of the factfinder concerning the weight and credibility of the evidence. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). We permit juries to draw multiple inferences from facts as long as each inference is supported by the evidence presented at trial. *Temple*, 390 S.W.3d at 360.

A person commits the offense of continuous sexual abuse of a child if:

> (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and

> (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is [] a child younger than 14 years of age[.]

Tex. Penal Code Ann. § 21.02(b)(1), (2)(A).

Section 21.02 of the Penal Code defines "act of sexual abuse" as including, among other things, an act that constitutes the offense of aggravated sexual assault and indecency with a child. *Id*. § 21.02(c)(2), (4). A person commits the offense of aggravated sexual assault of a child if the person intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means and the victim is younger than fourteen years of age. *Id*. § 22.021(a)(1)(B)(i), (a)(2)(B). A person

15

commits the offense of indecency with a child if he "(1) engages in sexual contact with the child or causes the child to engage in sexual contact; or (2) with intent to arouse or gratify the sexual desire of any person: (A) exposes the person's anus or any part of the person's genitals, knowing the child is present; or (B) causes the child to expose the child's anus or any part of the child's genitals." Tex. Penal Code Ann. § 21.11(a)(1), (2). The State need not prove the exact dates of the abuse, only that "there were two or more acts of sexual abuse that occurred during a period that was thirty or more days in duration[.]" *Brown v. State*, 381 S.W.3d 565, 574 (Tex. App.— Eastland 2012, no pet.); *Lane v. State*, 357 S.W.3d 770, 773-74 (Tex. App.— Houston [14th Dist.] 2011, pet. ref'd).

In part of his sufficiency challenge, Zepeda asserts that "[t]here is no evidence or testimony to corroborate that during a period of 30 or more days in duration, [Zepeda] committed two or more acts of sexual abuse against [Kate] and [Nancy]." As detailed above, Kate told the SANE examiner the abuse occurred for "approximately two years[]" from third grade to fifth grade, with the last assault occurring more than a week before the examination. Nancy also stated that her stepfather touched her last year, but "not much this year[,]" during her examination with Hoffman. Domingue testified that Kate told her that Zepeda touched her vagina and put his penis in her mouth, more than one time between third and fifth grade. Finally, there was testimony from Kate, that while she could not put a definitive

16

number on the times that Zepeda sexually assaulted her, it started a month after he moved into her home, and it was "more than one time." This testimony supplements the undisputed testimony from both Zepeda and Mother that he moved into Mother's home in 2013 and left the home after Kate and Nancy outcried about the sexual abuse in 2016.

While Zepeda denied all sexual abuse and other witnesses testified that the children appeared happy and there was no physical evidence of the abuse found during the examinations performed on the children, the weight to be given contradictory testimonial evidence is within the sole province of the jury because it turns on an evaluation of credibility and demeanor. *See Cain v. State*, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997); *see also, e.g., Reed v. State*, 991 S.W.2d 354, 360 (Tex. App.—Corpus Christi 1999, pet. ref'd) (evidence sufficient to support aggravated sexual assault of a child conviction based on victim's testimony even though the testimony was contradictory). As the factfinder, the jury was entitled to judge the credibility of each witness, and the jury could accept some portions of a witness's testimony while rejecting others. *See Hughes v. State*, 897 S.W.2d 285, 289 (Tex. Crim. App. 1994). The testimony from a child who testifies that she is the victim of a sexual assault is sufficient to support a defendant's conviction for sexual assault. Tex. Code Crim. Proc. Ann. art. 38.07(b)(1); *Carr v. State*, 477 S.W.3d 335, 338 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd).

17

As for Appellant's argument that the evidence is circumstantial and that there is no direct evidence of assault, "[t]he lack of physical or forensic evidence is a factor for the jury to consider in weighing the evidence." *Lee v. State,* 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). The jury heard testimony from Hoffman, a forensic nurse and the girls' SANE examiner, that she conducted the exam on Kate more than a week after the last alleged sexual assault by Zepeda and that, given the nature of the allegations, it is not unusual that there would be a lack of physical injuries.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found the essential elements of the offense of continuous sexual abuse of a child beyond a reasonable doubt. *See Brooks*, 323 S.W.3d at 912; *Hooper*, 214 S.W.3d at 13. We overrule Appellant's sufficiency issue.

### Evidentiary Issues

In Zepeda's final three issues, he challenges several of the trial court's evidentiary rulings. First, he argues the trial court abused its discretion when it overruled a hearsay objection during nurse practitioner Francisco Martinez's testimony. Second, he contends the trial court erred when it allowed the testimony from Nancy regarding extraneous offenses or acts under article 38.37 of the Code of

Criminal Procedure. Finally, he claims the trial court erred when it granted the State's motion in limine regarding Kate's and Nancy's immigration status.

**Hearsay objection**

In his first evidentiary issue, Zepeda argues that the trial court erred when it overruled Zepeda's hearsay objection during Francisco Martinez's testimony. Martinez was a nurse practitioner at Memorial Hermann Hospital and spoke with the children when their mother brought them to the hospital for an examination. Martinez testified that Kate and Nancy told Martinez that Zepeda last touched them a week before their examination. Zepeda contends that Kate's and Nancy's accounts about what they were claiming Zepeda had done to them were "bolstered by the repetition of [t]his hearsay statements through Mr. Martinez."

While out-of-court statements may be hearsay if offered for the truth of the matter asserted therein, there are exceptions to the hearsay rule. *See* Texas Rule of Evidence 803. The State argues the exception in Rule 803(4) applies. This exception to the rule against hearsay pertains to statements made for medical diagnosis or treatment. *Id*. This exception expressly provides that it includes "[a] statement that is made for—and is reasonably pertinent to—medical diagnosis or treatment; and describes medical history; past or present symptoms or sensations; their inception; or their general cause." Tex. R. Evid. 803(4).

Generally, to establish this exception, the proponent must show that the declarant knew that the statement was being made for purposes of medical diagnosis or treatment, that proper diagnosis or treatment depended on the declarant's veracity, and that the statement offered was pertinent to treatment or diagnosis. *See Taylor v. State*, 268 S.W.3d 571, 578−79, 589, 591 (Tex. Crim. App. 2008). The declarants who made the statements, here Kate and Nancy, were taken to the hospital for an examination. We look to the entire record to determine whether a child understands the importance of being truthful when being questioned by medical personnel. *Calvert v. State,* No. AP-77,063, 2019 Tex. Crim. App. Unpub. LEXIS 584, at *116 (Tex. Crim. App. Oct. 9, 2019) (not designated for publication) (citing *Franklin v. State*, 459 S.W.3d 670, 676-77 (Tex. App.—Texarkana 2015, pet. ref'd); *Beheler v. State*, 3 S.W.3d 182, 188 (Tex. App.—Fort Worth 1999, pet. ref'd). The Texas Court of Criminal Appeals has stated, "it seems only natural to presume that adults, and even children of a sufficient age or apparent maturity, will have an implicit awareness that the [medical personnel]'s questions are designed to elicit accurate information and that veracity will serve their best interest." *Taylor,* 268 S.W.3d at 589. It is reasonable to assume that a child of sufficient age understands that statements made to a recognized medical professional, such as a physician or nurse, are "made for the purpose of medical diagnosis or treatment." *Gohring v. State*, 967 S.W.2d 459, 463 (Tex. App.—Beaumont 1998, no pet.). The witness does not have

20

to expressly state that the victim recognized the need to be truthful in their statements for the medical treatment exception to apply. *See Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd). "[C]ourts can infer from the record that the victim knew it was important to tell a SANE the truth in order to obtain medical treatment or diagnosis." *Franklin*, 459 S.W.3d at 677 (citing *Prieto v. State*, 337 S.W.3d 918, 921 (Tex. App.—Amarillo 2011, pet. ref'd).

The record supports an inference that Kate and Nancy understood the importance of being truthful for the purpose of medical diagnosis or treatment. *See Fahrni v. State,* 473 S.W.3d 486, 497-98 (Tex. App.—Texarkana 2015, pet. ref'd) (citing *Taylor*, 268 S.W.3d at 589); *see also Gohring*, 967 S.W.2d at 463 (ordinarily it is reasonable to assume that a child will understand that a statement given to a "recognizable health professional, such as a physician, nurse, psychologist, or mental health therapist[]" will be for the purpose of medical diagnosis or treatment); *Beheler*, 3 S.W.3d at 188 ("there is no requirement that a witness expressly state that the hearsay declarant recognized the need to be truthful in her statements for the medical treatment exception to apply[,]" even if that declarant is a child). The circumstances surrounding Kate and Nancy's examination by Martinez in the emergency room allowed the trial court to reasonably conclude that Martinez thought the information about the timeline of the alleged assault was important and for purposes of medical treatment to the children.

21

We conclude that the trial court did not abuse its discretion in admitting Martinez's testimony as it relates to Kate and Nancy's statements describing their sexual assaults. *See* Tex. R. Evid. 803(4). We overrule this issue.

**Article 38.37 Testimony**

In his second evidentiary issue, Zepeda argues that the trial court erred when it allowed the State to present Nancy's testimony about extraneous offenses or acts under article 38.37, section 1(b) of the Texas Code of Criminal Procedure. *See* Tex. Code. Crim Proc. Ann. art. 38.37, § 1(b).

During the jury trial, the trial court held a hearing outside the presence of the jury to determine whether extraneous offenses would be admitted under Texas Code of Criminal Procedure article 38.37. *See* Tex. Code Crim. Proc. Ann. art. 38.37. The trial court determined that Nancy could testify about extraneous offenses against her. Specifically, the trial court determined that Nancy could testify that Zepeda tried to, in more than one instance, put "his private parts in my private parts[,]" in Zepeda and Mother's bedroom. During the hearing, Nancy stated she could not testify as to the exact date or how many times Zepeda assaulted her in this way, and she recalled that Zepeda told her not to tell anyone about the sexual assault. After the hearing, the defense argued against the admission of the extraneous offense, stating the State had not met it's burden under article 38.37.

> She hasn't mentioned any of this until recently to the prosecutor. It's something new that she's remembering evidently. I don't know that

22

they meet their burden under 38.37 as far as the extraneous acts. She -- there's nothing -- nothing to indicate that that it actually happened. There's been no report to any -- any other authority other than [the prosecutor]. I think we should stay there. I don't think they met their burden under 38.37, Judge.

The defense made no other objections at trial regarding this testimony. The trial court overruled Zepeda's objection, finding "I do find that it would be adequate support - - to support a finding by the jury that the defendant committed that separate offense beyond a reasonable doubt."

We review a trial court's ruling on the admissibility of extraneous offense evidence for an abuse of discretion. *Devoe v. State,* 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). A trial court does not abuse its discretion if its decision falls within the "zone of reasonable disagreement." *Id.* "If the trial court's decision on the admission of evidence is supported by the record, there is no abuse of discretion, and the trial court will not be reversed." *Marsh v. State*, 343 S.W.3d 475, 478 (Tex. App.— Texarkana 2011, pet. ref'd). Reviewing courts should not substitute their judgment for that of the trial court. *Id*. Also, "a court of appeals may not *reverse* a judgment of conviction without first addressing any issue of error preservation." *Meadoux v. State*, 325 S.W.3d 189, 193 n.5 (Tex. Crim. App. 2010) (emphasis in original).

"The erroneous admission of extraneous-offense evidence constitutes non-constitutional error[.]" *Pittman v. State*, 321 S.W.3d 565, 572 (Tex. App. —Houston [14th Dist.] 2010, no pet.). An appellate court may not reverse for non-constitutional

error if, after examining the record as a whole, the appellate court has "fair assurance that the error did not have a substantial *and* injurious effect or influence in determining the jury's verdict." *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004) (citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (emphasis in original); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)); *see also* Tex. R. App. P. 44.2(b). Therefore, even if evidence were admitted by a trial court in error, substantial rights are not affected by the erroneous admission of evidence "'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'" *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (quoting *Johnson,* 967 S.W.2d at 417). If the trial court's evidentiary ruling is correct under any applicable theory of law, it will not be disturbed. *See Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

Generally, an accused must be tried only for the charged offense and may not be tried for a collateral crime or for being a criminal generally. *Harris v. State*, 475 S.W.3d 395, 399 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd); *see also* Tex. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

24

Article 38.37, section 1 of the Code of Criminal Procedure, which applies to the prosecution of a defendant for offenses including continuous sexual abuse of a child, provides:

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including:
>
> (1) the state of mind of the defendant and the child; and
>
> (2) the previous and subsequent relationship between the defendant and the child.

Tex. Code Crim. Proc. Ann. art. 38.37, § 1(b).

Article 38.37, section 2, also applicable to a trial for continuous sexual abuse of a child, provides:

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, and subject to Section 2–a, evidence that the defendant has committed a separate offense described by Subsection (a)(1) or (2) [including an offense of aggravated sexual assault of a child] may be admitted in the trial of an alleged offense described by Subsection (a)(1) or (2) for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant.

*Id*. art. 38.37, § 2(b); *see also Belcher v. State*, 474 S.W.3d 840, 844 (Tex. App.—Tyler 2015, no pet.) (noting that section 2(b) allows admission of evidence that defendant has committed certain sexual offenses against nonvictims of charged offense).

Section 2–a provides as follows:

Before evidence described by section 2 may be introduced, the trial judge must:

(1) determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt; and

(2) conduct a hearing out of the presence of the jury for that purpose.

Tex. Code Crim. Proc. Ann. art. 38.37, § 2. On appeal, Zepeda argues that the evidence violated the article 38.37 because it did not demonstrate the state of mind of Zepeda and the child, and a previous and subsequent relationship between Zepeda and Nancy, because a "mere denial of the commission of an offense generally does not open the door to extraneous offenses[,]" and this testimony was admitted elsewhere and established through other witnesses. Additionally, he argues the evidence fails under the Texas Rules of Evidence as it is not relevant, not admissible to prove that he acted in accordance with the character or trait on a particular occasion, and more prejudicial than probative.

Zepeda was charged with the continuous sexual abuse of a child under section 21.02 of the Penal Code, an offense to which article 38.37 applies. *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 1(a)(1)(A); Tex. Penal Code Ann. § 21.02(b). Therefore, under section 1(b) of article 38.37, evidence of other crimes or wrongs committed by the defendant against the alleged child victim "*shall* be admitted for its bearing on relevant matters[.]" *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 1(b)

26

(emphasis added). We conclude that the trial court did not abuse its discretion in allowing Nancy's testimony pertaining to the penis in vagina incident because the testimony met the requirements under article 38.37, section 1(b) of the Texas Code of Criminal Procedure.

Furthermore, section 2 of article 38.37 also applies. *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 2(a)(1)(B) (section 2 applies where the defendant is tried for continuous sexual abuse of a child under section 21.02 of the Penal Code). Therefore, evidence that the defendant committed a separate offense included in Chapter 21 of the Penal Code may be admitted "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 1(a)(1)(A), § 2(b).

The trial court conducted a hearing outside the presence of the jury and did not abuse its discretion in overruling the objection. The complained-of evidence was admissible under section 1(b) and section 2. The evidence was relevant to show Zepeda's state of mind and the relationship between Zepeda and the alleged victim. *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 1(b). The defense offered no witnesses nor any other evidence about the penis in vagina incident, and the trial court instructed the jury not to consider evidence of "crimes, wrongs, or acts other than the offense alleged against him in the indictment in this case . . . unless you find and

27

believe beyond a reasonable doubt that the Defendant committed such other crimes, if any were committed, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the Defendant, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose." We presume the jury followed the court's instruction. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

While not framed as separate issues, Zepeda cites to the Texas Rules of Evidence 404 for the proposition that extraneous offenses should not have been admitted here against him. *See* Tex. R. Evid. 404; Tex. Code. Crim. Proc. Ann. art. 38.37. With respect to Zepeda's assertion the extraneous offenses were not admissible under Texas Rules of Evidence 404, article 38.37 expressly states such evidence may be admitted "[n]otwithstanding Rules 404 and 405[.]" Tex. Code Crim. Proc. Ann. art. 38.37, § 2(b); *see also Vajda v. State*, No. 09-16-00371-CR, No. 09-16-00372-CR, No. 09-16-00378-CR, 2017 WL 6062469, at *4 (Tex. App.—Beaumont Dec. 6, 2017, pet. ref'd) (mem. op., not designated for publication) (concluding trial court did not err and Rule 404 did not preclude admission of extraneous offense evidence of the possession of child pornography in trial of sexual assault of a child). We also note that Zepeda failed to make a Rule 404 or 405 objection at trial.

Zepeda further asserts that the evidence of extraneous offenses should not have been admitted as such evidence was irrelevant and unfairly prejudicial. *See* Tex. R. Evid. 401-403. Generally, all relevant evidence is admissible. Tex. R. Evid. 402. Relevant evidence is evidence that tends to make a fact more or less probable or is of consequence in determining the action. Tex. R. Evid. 401. An exception to the general rule that relevant evidence is admissible is if a trial court concludes its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues. Tex. R. Evid. 403. There were no objections made at trial to the extraneous offense testimony of Nancy on relevance grounds, unfair prejudice, or confusion of the issues. Therefore, Zepeda has failed to preserve these complaints for appeal. *See* Tex. R. App. P. 33.1(a). We overrule this issue.

**Motion in Limine**

In his final evidentiary issue, Zepeda argues the trial court erred when it granted the State's motion in limine regarding the "alleged victims' . . . immigration status." Zepeda directs this Court's attention to the Confrontation Clause, the Sixth and Fourteenth amendments of the United States Constitution, and Texas Rules of Evidence arguing the motion in limine limited his right to confront or cross-examine the alleged victims and their immigration status. *See* U.S. CONST. amends. VI, XIV; Tex. R. Evid. 607.

At trial, before his case in chief, Zepeda approached the trial court regarding the State's motion in limine of Mother's immigration status. Zepeda argued that this is an issue in the case because she and Zepeda are both from Guatemala, and there was motive for her to lie because "[s]he gets victim status for making sure he is convicted. She's illegal as well. That raises her to the top of the list of, you know, victim – being a victim." Specifically, he argued there was a motive for Mother to lie. The State responded that there was absolutely no testimony or evidence that Mother availed herself of this program or that she even knew it was available to her, and that Zepeda had the opportunity to cross-examine her on this issue. The trial court denied Zepeda's request, stating that there was not "enough out there" in the testimony to "touch the immigration issue[,]" and that it was not relevant.

As noted above, Zepeda complains that the trial court violated his constitutional right to present a complete defense when it refused to permit him to cross-examine Mother on her immigration status. At the motion in limine hearing, defense counsel argued that the evidence of Mother's immigration status was relevant to his theory that she had a motive to lie, but he did not cite any rules of evidence, cases, or constitutional provisions to support his contention that the evidence was admissible. Zepeda's counsel did not raise the issue during his cross-examination of Mother at trial. Because Zepeda failed to object at trial to the exclusion of the testimony based on his constitutional right to present a defense, we

conclude Zepeda has failed to preserve this complaint for appellate review. *See Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (concluding appellant waived his federal constitutional due process rights when he failed to lodge an objection at trial); *Wright v. State*, 374 S.W.3d 564, 575-76 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (concluding appellant did not preserve issue for review when appellant failed to specifically assert in the trial court that the evidentiary rulings violated her constitutional right to present a defense).

Zepeda also complains that the trial court violated his constitutional right to confront witnesses when it refused to permit him to cross-examine Mother on her immigration status. A defendant must preserve error in the trial court to argue on appeal that his right to confront witnesses was violated. *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009); *Deener v. State*, 214 S.W.3d 522, 527 (Tex. App.—Dallas 2006, pet. ref'd). To preserve error on Confrontation Clause grounds, a defendant must make a sufficiently specific objection on that basis. *Reyna v. State*, 168 S.W.3d 173, 179-80 (Tex. Crim. App. 2005). Defense counsel did not raise a confrontation clause or argue the trial court violated his right to present a defense by failing to allow him to cross-examine Mother about her immigration status during trial. Therefore, Zepeda cannot make this argument on appeal. *Id.*; *see also* Tex. R. App. P. 33.1. We conclude that Zepeda did not preserve these complaints, because he failed to do "'everything necessary to bring to the judge's

attention the evidence rule or statute in question and its precise and proper application.'" *See id*. at 177 (quoting *Martinez v. State,* 91 S.W.3d 331, 335-36 (Tex. Crim. App. 2002)).

Even if Zepeda had preserved these issues for review, we review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004). An abuse of discretion occurs when the trial court acts without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). Based on the record, we conclude the trial court's ruling was not an abuse of discretion. A trial court maintains broad discretion to impose reasonable limits on cross-examination and "[i]n weighing whether evidence must be admitted under the Confrontation Clause, the trial court should balance the probative value of the evidence sought to be introduced against the risk its admission may entail." *Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000).). Here, the trial court found the testimony was not relevant and further noted on the record that the nature of Mother's immigration status would be highly prejudicial, and the prejudicial nature of the testimony would outweigh any potential relevance. *See* Tex. R. Evid. 403; *Lopez*, 18 S.W.3d at 222. Zepeda's counsel also admitted on the record that he had been unable to verify the claims that Mother was using this case to avail herself of immigration laws to gain "victim status." Zepeda presented no evidence to support

his claim that Mother was attempting to claim "victim status" to gain asylum, and the trial court could have concluded that the questions Zepeda sought to ask would constitute no more than a mere fishing expedition with a substantial prejudicial effect. Consequently, we find no abuse of discretion in the trial court's ruling. We overrule Zepeda's last evidentiary issue.

## Conclusion

Having overruled all of Zepeda's issues on appeal, we affirm the judgment of the trial court.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on May 2, 2023
Opinion Delivered January 10, 2024
Do Not Publish

Before Horton, Johnson and Wright, JJ.